1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

EDWARD VINCENT RAY, III,

                 Petitioner,

  vs.

MATTHEW CATE, Warden,

             Respondent.

———————————————————————/

No. C 11-1604 YGR (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, MOTION FOR RECONSIDERATION AND CERTIFICATE OF APPEALABILITY**

      This matter is now before the Court for consideration of Petitioner Edward Vincent Ray, III's pro se Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. The Court ordered Respondent to show cause why the writ should not be granted. Respondent filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits with the court. Petitioner filed a traverse and a motion for reconsideration of the Court's denial of his motion for production of the state court transcript of the hearing on his *Marsden* motion. *See* Doc. no. 22 (Motion for Transcripts); Doc. no. 68 (Order Denying Motion); Doc. no. 111 (Motion for Reconsideration). For the reasons set forth below, the motion for reconsideration and the Petition are DENIED. In addition, no certificate of appealability will be issued.

**PROCEDURAL BACKGROUND**

      On March 20, 2007, a jury found Petitioner guilty of twenty-nine counts of robbery on twenty-three separate occasions between July 12, 2005, and August 27, 2006. Petitioner was also convicted of one count each of attempted robbery and misdemeanor assault. On October 5, 2007, Petitioner was sentenced to a total term of eight years in prison. Petitioner's co-defendant and father, Edward Vincent Ray, Jr., ("Ray Jr."), was convicted of twenty-one counts of robbery and sentenced to an aggregate term of thirty-eight years, four months in prison.

      On November 23, 2009, the California Court of Appeal, in an unpublished decision, affirmed

**United States District Court**
For the Northern District of California

1  the judgment of Petitioner and Ray Jr.  Doc. no. 32, Resp. Exh. A, *People v. Ray, Jr.*, 2009 WL

2  4023678 (Cal. App. Nov. 23, 2009).  Petitioner sent the California Supreme Court a pro se petition

3  for review, which was marked "received" on February 10, 2010.  Doc. no. 32, Resp. Ex. C.  On

4  January 8, 2010, Petitioner filed a petition for a writ of habeas corpus with the California Supreme

5  Court, case number S179314 ("First Supreme Court Petition").  Doc. no. 32, Resp. Ex. D.  On March

6  10, 2010, the Court summarily denied the habeas petition.  Doc. no. 32, Resp. Ex. E.

7       On April 1, 2011, Petitioner filed a federal petition for a writ of habeas corpus in which he

8  raised eleven main claims.  On August 16, 2011, the Court issued an Order to Show Cause, directing

9  Respondent to file an answer.

10      On June 6, 2011, Petitioner filed a second habeas petition in the California Supreme Court,

11 case number S193767 ("Second Supreme Court Petition").  Doc. no. 32, Resp. Ex. F.  On October 12,

12 2011, the Court denied the petition, citing *In re Clark*, 5 Cal. 4th 750, 767-69 (1993).  Doc. no. 32,

13 Resp. Ex. G.

14      On October 27, 2011, Petitioner moved to amend his federal petition.  Doc. no. 9.  His

15 "amended petition," is a copy of his Second Supreme Court Petition.  Doc. no. 70.  On September 28,

16 2012, the Court granted Petitioner's motion to file an amended petition.  Doc. no. 68.  Previously, on

17 December 2, 2011, the Court had also related this case to the earlier filed case of Ray Jr., *Ray v. Cate*,

18 No. C 10-1582 SI (PR).  On June 6, 2013, the Court issued an order in the related case denying Ray

19 Jr.'s petition and a certificate of appealability.  *See* Case no. C 10-1582 YGR (PR), Doc. no. 91.

20      On March 7, 2012, Respondent moved to dismiss Petitioner's now amended petition as

21 untimely or, in the alternative, to dismiss all but two claims as procedurally defaulted.  Doc. no. 32.

22 On January 10, 2013, the Court denied the motion on the issue of untimeliness and summarily denied

23 the motion on the procedural default issue, stating that "Respondent's contentions regarding

24 procedural default are better raised in an answer, which will also contain a discussion of the claims'

25 merits."  Doc. no. 84 at 3.

26                          **FACTUAL BACKGROUND**

27      Petitioner, who was born on October 17, 1987, was seventeen years old at the time he

28 committed the robberies charged in Counts 2 and 3.  Clerk's Transcript ("CT") at 1139, Probation

United States District Court

For the Northern District of California

Report.  The facts relating to Petitioner's convictions, as described by the California Court of Appeal, are as follows:[1]

> Between July 12, 2005, and August 27, 2006, the Ray family (immediate and extended) engaged in a prolific and profitable enterprise robbing a variety of establishments, primarily convenience stores, in Oakland, Alameda, and Hayward. Their entrepreneurial effort came to an abrupt halt on August 27, 2006, when both Ray Jr. and Ray III were apprehended fleeing the scene of what proved to be their last robbery-a 7-Eleven store at 2411 MacArthur Boulevard in Oakland. The operation further unraveled when Ray III, in an apparent lack of filial devotion, gave a detailed statement to the police chronicling the family exploits and the role of his father, his sister Melissa, and her boyfriend Carrington in the various robberies. Finally, Carrington accepted a plea bargain and testified against both Ray Jr. and Ray III at trial.  The offenses, and the evidence relating to each count, are outlined here in chronological order.

> *Counts 2 and 3-Robberies of Allen Kung and Christina Miller at Longs Drugs in Oakland on July 12, 2005 [Ray Jr. and Ray III]*

> The first chapter in this crime spree began on July 12, 2005, at a Longs Drugs located at 51st Street and Broadway, in Oakland (counts 2 & 3). Allen Kung was the manager of the store and Christina Miller was a cashier.  At about 11:50 p.m., three persons entered the store, wearing masks and gloves.  Kung described one individual as about six feet tall and skinny-about 150 pounds, wearing a grey hooded sweater.  Kung could tell by the individual's voice that he was a man, and he could see through the openings in the mask that the man was Caucasian.  The second person was about five feet five inches tall, and wearing all black (Ray Jr. is approximately five feet nine inches or five feet ten inches tall).  Kung believed from the person's voice that the second individual also was male.  The shorter robber carried a nine-millimeter handgun.

> The taller robber pointed a gun at Christina Miller, demanding that she open the safe or he would kill her.  He ordered Kung to open the safe and also what the robber referred to as the "Reno Box ."  The "Reno box" was a box into which cashiers would deposit large denomination currency.  Store cashiers were familiar with this term.  Kung removed the money from the "Reno box," from the change box, and from the safe, dropping it into a duffel bag held by the shorter robber. Kung estimated the loss at $50,000.

> The robbery was captured on surveillance video.  In his post-arrest statement, Ray III stated that he had committed this robbery (as well as one other uncharged offense) with "Ozell," a friend whose last name he did not know.

> *Count 4-Robbery of Jimmie Ngo at Longs Drugs in Oakland on November 21, 2005 [Ray III, Carrington and Melissa]*

> Alan Kung was again working as the night manager at Longs Drugs when it was robbed for the second time on November 21, 2005, at about 11:50 p.m.  Jimmy Ngo was another manager on duty.  Three or possibly four robbers entered the store and forced Ngo to open the safe.  Kung thought he recognized the tallest of the three, who brandished a crowbar, from the July robbery.  One of the robbers, possibly the tallest one, had a knife.  Kung described one of the other two as about five feet eight inches tall, and the third as about five feet five inches tall.

---

[1]  This summary is presumed correct. *See Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

United States District Court

For the Northern District of California

Kenneth Rivers, a security guard, was at the main entrance to the store when the three robbers arrived. One forced him to his knees at gunpoint, and the other two made the manager open the safe. After the robbers fled, Rivers ran outside and saw a light colored late model Honda Civic leaving the area. Around that time Oakland Police Evidence Technician Katharine Potter was called to process a white Honda Civic abandoned with the motor running and a door open a couple blocks from the scene of the robbery. Inside was a black beanie or ski mask with the eyes and mouth cut out of it and a dark colored bandana.

Carrington testified that Ray III had repeatedly asked him to participate in a robbery and that he finally agreed to do so. He said that Ray III and Melissa picked him up at about 10:00 p.m. on an evening in November 2005, in a Honda that he believed was stolen. They drove to the Longs Drugs at 51st and Broadway in Oakland and robbed the store, getting about $12,000 from the store. After the robbery they went to a hotel in Alameda where they met Ray Jr.

Ray III told the police that he robbed the Longs Drugs store for a second time, with Carrington and Melissa, about six or seven months after the first robbery. Ray III said he had a knife and that Carrington held the security guard. As in other robberies, they used two stolen Hondas, driving to the location in one and leaving in another to make pursuit more difficult. They always used Hondas because that was the only brand of car that he knew how to steal. Ray III also said that they went to a hotel in Alameda after the robbery.

*Counts 5 and 6-Robberies of Sandeep Kumar and Kuldip Sekhon at the 7-Eleven Store on Harrison Street in, Oakland on April 18, 2006 [Ray Jr. and Ray III]*

On April 18, 2006, Sandeep Kumar and Kuldip Sekhon were working at the 7-Eleven store at 2350 Harrison Street, Oakland. At about 1:45 a.m., two men arrived in a silver colored Honda (observed on surveillance video) and entered the store. Both wore dark sweatshirts and had their faces covered. One was about five feet seven inches tall, and the other a little taller. One had a small silver gun. Both victims were ordered behind the register, and Kumar was forced to open the register. The robbers took the cash trays with money, lottery tickets and cigarettes.

*Count 7-Robbery of Gary Boland at Voila Café in Oakland on April 21, 2006 [Ray III and Carrington]*

On April 21, 2006, at approximately 10:50 a.m., Gary Boland, the owner of the Voila Café located at 510 Derby Avenue, Oakland, was watering plants just inside the front door of his business with his back to the door. A person came up behind him, held a metal object that he believed to be a gun to the side of his head, and said "welcome to Oakland, mother fucker." Boland was ordered to open the cash register, and the robber took about $200.

He could hear a conversation between the first robber and a second person, whom he could not see, about how to take the money, with the second person giving directions. He described the first robber as about five feet ten inches or five feet eleven inches tall, wearing a hooded jacket, dark clothing, with a red bandana as a mask. From the sounds of his voice and the small area of skin he could see, Boland believed the first robber was White.

At the time of the robbery, Ricardo Arias Tirado was working about one-half block from the café. He saw two men in a two door Honda drive past. Both had kerchiefs covering the lower portions of their faces, and both had hoods pulled up. The car drove around the block and pulled up in front of the café. The two men exited, leaving the car in the middle of the street with the doors open, and entered the café. They were inside for less than two minutes before they returned to the car and left. When returning to the car, one man was waving something in his hands that Arias Tirado thought might be a weapon.

4

**United States District Court**
For the Northern District of California

Ray III admitted robbing the Voila juice bar on two occasions, once in April using a stolen car and a fake gun. Carrington said he robbed a juice bar on one occasion. He also said that Ray Jr., in describing robberies in which Carrington was not involved, mentioned a robbery of a juice bar.

*Counts 8 and 9-Robberies of Frezghi Tesfamicheal and Darshan Singh at the 7-Eleven Store on 41st and Broadway in Oakland on April 24, 2006 [Ray Jr. and Ray III]*

On April 24, 2006, at about 1:30 a.m., Frezghi Tesfamicheal and Darshan Singh were working as clerks at the 7-Eleven store at 41st and Broadway in Oakland. Two men exited a small silver car and ran into the store. One man, wearing a black hooded sweatshirt, with his lower face covered, pointed a gun at Tesfamicheal and told him not to move. He was about five feet seven inches tall, and Tesfamicheal believed that the man was White from the area of his eyes that Tesfamicheal could see. The second robber was taller, about six feet two inches tall, wearing a grey sweatshirt, and seemed to be slightly older than the gunman. The gunman ordered Singh to open the cash register, and made both Tesfamicheal and Singh face the wall near the register. The men took cash from the register, although Tesfamicheal did not know how much, and cigarettes.

The robbery was captured on surveillance video. Ray III told police that he had robbed the 7-Eleven store at 41st and Broadway on two or three occasions.

*Count 11-Robbery of Sandeep Kumar at the 7-Eleven Store on Harrison Street in Oakland on April 29, 2006 [Ray Jr. and Ray III]*

On April 29, 2006, at about 3:25 a.m., Sandeep Kumar and Kuldip Sekhon were again working at the 7-Eleven store at 2350 Harrison Street, Oakland. Two men, similar to the two who had earlier robbed the store, entered wearing sweatshirts with hoods and cloths covering their lower faces. One had a small silver gun. Kumar was ordered to open the cash register and to surrender the money. The robbers also took cartons of cigarettes.

There was surveillance video of the robbery. Carrington identified the taller of the two robbers shown on the video as Ray III and the other as Ray Jr. Ray III admitted to police robbing this 7-Eleven store twice in April, and said that he carried a plastic gun both times.

*Count 12-Robbery of Nickolas Becker at Walgreens Drugstore at 34th Street and Telegraph Avenue in Oakland on May 13, 2006 [Ray Jr. and Ray III]*

On May 13, 2006, at about 10:00 p.m., the Walgreens at 34th Street and Telegraph Avenue was closing for the evening. Nickolas Becker was the assistant manager. Becker was at the door waiting for the last customers to leave when he saw a grey Toyota or Honda pull up quickly. A man with a gun exited and ran toward Becker. He described the gunman as about six feet tall and weighing 150-160 pounds, wearing a black sweatshirt with a hood, and with his face covered with a red bandana. From the facial area he could observe, Becker could tell that the gunman was White. A second man, shown on surveillance video, entered the store behind the gunman.

Becker was first forced to the floor and then walked to the cash register at gunpoint when a clerk was unable to open the register. The robbers took the entire till from the register with about $700. The second robber took packages and cartons of cigarettes from the area of another register.

From the surveillance video, Carrington identified Ray Jr. as the person holding a gun to Becker's head and Ray III as the second robber.

5

United States District Court

For the Northern District of California

*Count 13-Robbery of Vinh Lu at the Quick Stop Market on MacArthur Boulevard, Oakland on May 23, 2006 [Ray III and Carrington]*

On May 23, 2006, at approximately 6:40 a.m., Vinh Lu was working at the Quick Stop market at 66 MacArthur Boulevard, Oakland.  Two masked men entered the store with a gun, ordered him to pull out the cash register drawer and took all the money.  There was a surveillance video of the robbery.

Carrington testified that he committed a robbery of the Quick Stop on MacArthur with Ray III, going to the scene in a stolen Honda.  Ray III took the money and he took lottery tickets. Carrington identified himself on the videotape as the individual wearing a black hoodie, with a red bandana on his face.  He identified Ray III as the robber wearing a grey hooded sweatshirt, with a blue bandana on his face.

Ray III admitted to police that he had robbed this Quick Stop twice with Carrington, taking about $200 each time.

*Count 14-Robbery of Melisew Ayenew at the 7-Eleven Store at 41st and Broadway in Oakland on May 25, 2006 [Ray Jr. and Ray III]*

On May 25, 2006, at about 11:24 p.m., Melisew Ayenew was working as a clerk at the 7-Eleven store at 4100 Broadway, Oakland when two men entered with their faces partially covered and told everyone in the store not to move.  One of the robbers jumped the counter and took money from an open register.  The other pointed a pistol in Ayenew's face, demanding that he open another register, and striking him in the face with the pistol and kicking him when he protested that it was broken.  The blow drew blood.  The robbers took money from under the register that Ayenew pointed out and cigarettes.  Ayenew could see that one of the robbers was White, but could not see the face of the other.

Carrington again viewed a surveillance video of the robbery and identified Ray Jr. as the individual wearing a black hoodie and "army pants" and Ray III as the person behind the register wearing a grey hooded sweatshirt.  Ray III told police that he had robbed this store two or three times using a plastic BB gun, but denied hitting anyone.

*Count 15-Robbery of Jose Hernandez at Round Table Pizza in Alameda on May 28, 2006 [Ray Jr. and Ray III]*

On May 28, 2006, Jose Hernandez was the manager of the Round Table Pizza at 2611 Blanding Avenue, Alameda.  The store, which was doing pickup and delivery business only, was in a temporary trailer in an isolated area.  At about 9:30 p.m., after the restaurant had closed, Hernandez was sitting with friends in a back patio area when two men walked through the gate wearing dark clothes, with hoods over their heads and blue and red bandanas on their faces.  One had a chrome handgun pointed at Hernandez.  Hernandez was forced inside the trailer and made to open the safe.  The robbers took two day's worth of receipts, consisting of eight bundles of currency.  Hernandez described the gunman as between five feet eight inches and five feet ten inches tall, with blue eyes.  The second man was a little taller, and thin. Hernandez identified Ray Jr. as someone he had seen before in the area of the business.

Ray III, in his statement to police, said that he had robbed a Round Table in a trailer in Alameda near the Fruitvale Bridge.  He claimed that he had a plastic gun, and that he took about $1,000.

*Counts 16 and 17-Robberies of Yong Kim and Stephen MacManus at South Shore Liquor Store in Alameda on June 23, 2006 [Ray Jr. and Ray III]*

6

On June 23, 2006, at 9:30 p.m., two men wearing hoods and masks entered the South Shore Liquor store, located in the South Shore Center in Alameda. The owner, Yong Kim, was working at the cash register. Stephen MacManus was a customer. The taller of the two men held what Kim described as a long black gun and MacManus described as a shotgun with a black barrel and a dark brown stock. The man wore a black sweatshirt with the hood pulled up and a red bandana over his lower face. He was about six feet tall, and both Kim and MacManus could tell that he was White. The second man was shorter and held a grey or silver handgun. He wore a grey hooded sweatshirt with the hood pulled up, and a blue bandana over the lower part of his face.

The taller man pointed the shotgun at Kim and repeatedly demanded that he open the register. Kim gave the man the entire cash drawer containing about $700. The man with the shotgun then pointed it at MacManus and demanded his wallet. MacManus complied. MacManus looked at the face of this robber for about five to ten seconds, from a distance of about three feet. He could see the eyes, forehead, and some of the hair, which he said was sandy brown. He identified Ray Jr. in court as the man with the shotgun based on his complexion, the shape of his face, the area around his eyes, the color of his hair, and his height. He said that the build and general body shape of Ray III were consistent with the man with the handgun. In separate police lineups, MacManus had been unable to identify either Ray Jr. or Ray III.

Ray III admitted to police that he had robbed South Shore Liquor while wearing a hoodie and a bandana, and said that he had used a plastic handgun.

*Counts 18 and 19-Robberies of Seara Tesfamariam and Yash Hampaul at the 7-Eleven at 41st and Broadway in Oakland on June 30, 2006 [Ray Jr. and Ray III]*

On June 30, 2006, at about 4:00 a.m., two men with guns entered the 7-Eleven at 4100 Broadway in Oakland and told the clerk, Seara Tesfamariam, not to move. Both men wore black coats, blue jeans, and ski masks. One man was taller than Tesfamariam, who was five feet five inches tall, and the second man was taller than the first. The taller of the two men jumped the counter and told "Yosh," another clerk in the store, to open the register. He opened the register at gunpoint and the robbers took the money. They also took lottery tickets and cigarettes. Police located a Honda Civic abandoned about five minutes away in the 2800 block of Webster Street with the engine still running, and with the steering column and right rear window broken.

Carrington was unable to identify anyone from the surveillance video. This was the store that Ray III admitted robbing two or three times.

*Count 20-Robbery of Joseph Adkins at Walgreens in Alameda on July 6, 2006 [Ray Jr. and Ray III]*

On July 6, 2006, at 4:49 a.m., two armed men entered the Walgreens drugstore in the South Shore Shopping Center in Alameda. They were wearing black hooded sweatshirts, and had handkerchiefs covering the lower part of their faces. The shorter of the two men carried a shotgun, possibly sawed off, and the other had what assistant manager Joseph Adkins described as a Glock nine-millimeter handgun. The man with the shotgun forced Adkins to the registers and threatened to "blow [his] fucking head off" when Adkins had difficulty with his password. Once Adkins was able to open the register, the man grabbed the cash drawer which contained about $300. The second robber jumped over the counter at another register and took cigarettes. Adkins believed the robbers to be White or Hispanic.

Shortly after the time of the robbery, at about 5:00 a.m., Alameda police found a black Honda Civic about 300 yards from the Walgreens, abandoned with the engine running and the

7

ignition tampered with.

Carrington identified Ray III as one of the two robbers shown in the surveillance video, but "c[ould]n't say" who the other was. Carrington denied that he was the second robber, noting that this man wore "army pants," and that he never wore such pants.

Ray III told police that he had robbed the Walgreens in South Shore in Alameda, driving there in a stolen Honda Civic. He wore a hoodie, with a blue and white bandana on his face, a took about $200 and cartons of cigarettes.

*Count 22-Robbery of Francis Shelley at the 7-Eleven Store on 23rd Avenue in Oakland on July 10, 2006 [Ray Jr. and Ray III]*

On July 10, 2006, at 6:00 a.m., Francis Shelley was a customer in the 7-Eleven store at 324 23rd Avenue, Oakland. Two men entered, one with a gun, which Shelley described as a short-barrel shotgun. The clerk, Rita Thapa, described the gunman as about six feet tall and thin, wearing a sweatshirt, and with a dark blue or black handkerchief covering his lower face. The second person was shorter and wore a hooded sweatshirt. Both wore wrap-around sunglasses. Thapa thought both were Black. Shelley thought the gunman was Hispanic or Black, but could only see a small sliver of skin between the cheekbone and the sunglasses. Thapa was ordered to open the register and did so.

The gunman demanded Shelley's wallet, which was on the counter. When Shelley resisted the gunman struck him in the forehead with the weapon, drawing blood and gashing the skin to the bone, and knocking him to the floor. The robbers fled with the register cash drawer and with Shelley's wallet.

Shelley ran outside and saw the two men enter what he described as a burgundy front-wheel drive Japanese car, which a third person was driving. He was later taken by police to a location across from 527 23rd Avenue, near the Park Street Bridge to Alameda, where he identified a red Honda as the getaway car. The car had been found abandoned, with the engine running, no key in the ignition, and the ignition and steering column tampered with.

Shelley was taken to the hospital by ambulance for treatment of his wound. The wound required packing and stitches, and left a visible scar.

Ray III admitted to police that he had robbed the 7-Eleven store on 23rd Avenue.

*Count 23-Robbery of Andy Truong at AM/PM Market on Park Street in Alameda on July 18, 2006 [Ray Jr., Ray III and Carrington]*

On July 18, 2006, at approximately 5:24 a.m., Andy Truong was stocking merchandise in the AM/PM Market at 1260 Park Street, Alameda. Three men entered the store, one with a shotgun and another with a handgun. The man with the shotgun was wearing a hooded sweatshirt, gloves and a red bandana. Truong described him as White, in his 30s, and about five feet seven and one-half inches tall. The second gunman was younger, also White, and about seventeen or eighteen years old. The surveillance video showed that the man had his face covered with a blue bandana, although Truong did not recall this. The third person was a tall Black man.

The robber with the shotgun repeatedly ordered Truong to open the register, saying "open the fucking register," but Truong was unable to do so. He gave them a four digit code which failed to work, but they were ultimately able to open the register using the first two digits. They took the money. Before they left the older man with the shotgun said, "You lied to me," and struck Truong in the head with the shotgun. Truong suffered a bleeding wound requiring

eight staples to close.

Carrington testified that he committed the robbery with Ray Jr. and Ray III. He said that Ray Jr. had a shotgun, Ray III had a toy gun or a knife, and that he carried a toy shotgun. They drove to the scene in a stolen Honda. He saw Ray Jr. hit the Asian store clerk in the head with the shotgun before they left. Carrington identified Ray Jr. on photographs from the surveillance video as the person with the shotgun, and Ray III as the person at the register wearing the light blue bandana. He also identified himself on the tape. Ray Jr., giggling and laughing, later showed Carrington a newspaper article about the robbery mentioning the fact that the clerk required stitches. Ray Jr. appeared excited that he had made the papers.

During his police interview, Ray III was shown the surveillance video and identified himself and Carrington on the tape. They drove to the location in a stolen Honda, and took money and cigarettes.

The surveillance video also recorded the demands by the person with the shotgun that Truong "open the fucking register." Although Ray Jr. denied in his testimony that it was his voice on the tape, the video was played for the jury and the prosecution argued that Ray Jr.'s distinctive regional accent could be identified on the recording.

*Count 24-Robbery of Vinh Lu at the Quick Stop Market on MacArthur Boulevard in Oakland on July 20, 2006 [Ray III and Carrington]*

On July 20, 2006, at about 6:15 a.m., Vinh Lu was again robbed by two men at the Quick Stop Market at 66 MacArthur Blvd, Oakland. They were driving the same type of car, and appeared similar to the two robbers from the May 23, 2006 incident. One was armed with a gun and Lu was again forced to open the cash register. The men took about $20 and some lottery tickets.

A customer, Lowell Saturnino, observed a green four door Honda Civic pull in front of the store with two occupants wearing dark clothing and masks over their faces. Because "it didn't look right," he wrote down the license number before he drove away. He later saw the vehicle abandoned in the middle of the street about a block away and advised police of its location.

Carrington testified that he robbed this Quick Stop with Ray III on only one occasion. Ray III told police that he and Carrington had robbed the Quick Stop twice.

*Count 25-Robbery of Issa Abdul-Kareem at the 7-Eleven Store at 4720 MacArthur in Oakland on August 1, 2006 [Ray Jr. and Ray III]*

On August 1, 2006, at 3:55 a.m., two men with masks entered the 7-Eleven store at 4720 MacArthur Boulevard, Oakland. The clerk, Issa Abdul-Kareem, could tell from what skin area he could see that both were White. He said both were young, between 25 and 30 years old, and he described one as about five feet ten inches tall and 150 pounds. They talked to each other during the robbery "like family." One man had a gun and the other a knife. With both the gun and knife pointed at him, Abdul-Kareem opened the cash register and the men took the money from it. One of the men also took beer. He saw them flee in a newer Honda Civic. Police located the car about a block away with the motor running and the driver's door open.

The robbery was captured on surveillance video. Ray III admitted to a robbery of a 7-Eleven store "over by Seminary" about August 1st in which he used two stolen cars, and in which he used a knife.

9

United States District Court
For the Northern District of California

*Counts 26 and 27-Robberies of Alan Rodrigues and Annica Henderson at the 7-Eleven Store on Aldengate Way in Hayward on August 8, 2006 [Ray Jr., Ray III, and Carrington]*

On August 8, 2006, at 4:11 a.m., Alan Rodrigues was just leaving the 7-Eleven store on Aldengate Way in Hayward when three men with masks jumped out of a car parked behind Rodrigues's truck. They ordered him back into the store at gunpoint, with what he thought was a rifle. He described the man with the rifle as White and about five feet ten inches to six feet tall. This robber demanded Rodrigues's wallet, while the other two went behind the counter and opened the cash register. They left with money and beer.

Annica Henderson was also a customer inside the store when she saw the three robbers enter. One of the men, carrying what she thought was a small shotgun, demanded her wallet. She did not have one, but gave him $20. She described the person who took her money as the tallest of the three, about five feet eleven inches or six feet tall, with a thin build, wearing a pullover sweatshirt, and with a bandana covering his nose and mouth. She believed he was African-American. She described one of the other two as between five feet six inches and five feet eight inches tall, wearing a light colored hooded sweatshirt and a dark bandana, and carrying a knife. She could see from the skin around his eyes that he was Caucasian. The third robber, standing next to the other customer, was about five feet eight inches or taller, wearing a dark pullover sweatshirt and a bandana on his face. She thought he was African-American.

The robbery was captured on surveillance video. Carrington testified that he, Ray Jr. and Ray III went to the store in a stolen Honda. He identified Ray Jr. as the person wearing a black hoodie and camouflage pants. He identified himself behind the register wearing a blue jacket, and Ray III as the person next to him, wearing a beanie cap with the word "Oakland" on it. Ray III described to police a 7-Eleven robbery in Hayward in which they had forced a customer back into the store. He identified himself from still photos taken from the surveillance video wearing a black knit cap with the words "Oakland 510 bound" on it, and Carrington wearing a skateboard coat. He also identified a photo of Rodrigues as the person they had forced back into the store.

*Counts 28 and 29-Robberies of Justin Gray and Nicole Johnson at Safeway on College Avenue in Oakland on August 20, 2006 [Ray III and Carrington]*

On August 20, 2006, at 1:00 a.m., two men with shotguns entered Safeway on College Avenue in Oakland. Justin Gray was a customer waiting for change at a checkstand. One gunman, described as about five feet ten inches tall, wearing a jacket, a hood, something covering the lower part of his face and sunglasses, pointed his gun in Gray's face and demanded his wallet. He could only see the second gunman peripherally, but he seemed taller than the first man and was similarly dressed.

Nicole Johnson also was a customer in the store. A tall man pointed a shotgun at her friend, and Johnson ducked down near a cash register. Someone demanded Johnson's purse and she looked up to see a second robber pointing a pistol at her. He was about five feet ten inches tall, slender build, and was wearing a hoodie, ski mask, sunglasses and gloves. She could see some skin area and could tell that he was White. She surrendered her purse. She later indicated Ray III in one of two physical lineups as possibly being the man who took her purse.

Carrington testified that he and Ray III committed a robbery of this Safeway at 2:00 a.m., and that he believed that Ray III had taken a purse from a woman.

10

*Count 30-Attempted Robbery of Lourdes Jiminez at the Village Market on Broadway Terrace, Oakland on August 22, 2006 [Ray III and Carrington]*

On August 22, 2006, at 11:30 a.m., two men wearing sweatshirts, with bandanas covering their lower faces, entered the Village Market at 5885 Broadway Terrace, Oakland. Lourdes Jiminez worked in the deli department at the market. A man wearing a black hooded sweater pointed a gun at her and demanded that she open the cash register. She described him as about five feet eight inches tall. She was not a checker and was unable to open the register. The man unsuccessfully tried to open another register. She heard another male voice saying, "come on, let's go, let's go."

Horacio Valencia, who was doing construction work at the market, was in the parking lot when he saw the two men wearing masks pull into the parking lot in a black Honda Civic. They pointed a gun at him as they fled the store in the same vehicle. He saw that one of the two men had Black hands.

Carrington testified that he and Ray III had tried to rob the Village Market, but did not get any money. Ray III told police that he and Carrington had tried to commit a robbery on Broadway Terrace, but fled when a woman who worked in the "fruit department" couldn't open the register. The attempted robbery was recorded on surveillance video.

*Count 31 and 32-Robberies of Richard Klunge and Maria De Ayala at Voila Café in Oakland on August 22, 2006 [Ray III and Carrington]*

On August 22, 2006, at about 1:35 p.m., a light-complexioned blue-eyed White male, wearing a bandana to cover his face, entered the Voila Café (see also count 7). He pointed what may have been a toy gun at Maria De Ayala. De Ayala worked at the restaurant as a cook, server, and cashier. When she initially hesitated to open the cash register in response to the robber's demands, the gunman said "open the cash register, bitch." She finally did so and the gunman grabbed all the money. She saw only a shadow of a second man in the lobby area.

Richard Klunge, a customer in the restaurant, saw two people enter. One walked past him and the second, identified as a man by Klunge, pointed a handgun at him and demanded his wallet, which he surrendered. This gunman wore a hood and a mask, but Klunge could tell from skin around the eyes that he was African-American with a thin build, between five feet nine inches and five feet ten inches tall. The gun projected a laser dot. Klunge ran out of the restaurant when the robber pointed his gun at another customer. Klunge went to a nearby janitorial supply store to ask someone to call the police. He could see the two robbers run to a silver imported car parked in front of the restaurant and speed away. The robbery was captured on surveillance video.

Seng Saeliew was fishing with friends on a pier on Alameda Avenue, Oakland near the Fruitvale Bridge at around 1:30 p.m. on August 22, 2006. They were parked near a cream colored recreational vehicle (RV) with a brown stripe. He saw a small young attractive woman with blond hair in the RV talking to an older White man with light brown bushy hair, about five feet ten inches tall, who Saeliew described as looking like a hippie. The man and woman exited the RV and seemed to be waiting for someone. Saeliew heard a screeching noise and saw a silver Honda Civic come to a stop about 60 feet from the RV. He saw two men exit, both about five feet seven to five feet eight inches tall, with thin builds, and enter the RV after speaking to the man and woman. All four people then left in the RV. The doors and windows of the Honda were left open with the engine running, and Saeliew saw that there was no key in the ignition.

Carrington testified to participating in a robbery of a juice bar on the same date of the

11

attempted robbery of the Village Market (see count 30). He identified himself and Ray III on the surveillance video. He said that he took a wallet from a customer, using a toy gun with a laser pointer, while Ray III went behind the counter. After the robbery they met Ray Jr. at a motorhome that Ray Jr. was driving.

Ray III told police that he and Carrington robbed the juice bar wearing hoodies, beanies and bandanas. Carrington's toy gun had a "little red dot thing." They used a stolen grey Honda Civic. After the robbery they left the car near the Fruitvale Bridge and met Ray Jr. at his RV.

*Count 33-Assault on Kevin Mixon at Safeway on College Avenue in Oakland on August 25, 2006 [Ray III, Carrington, and Melissa]*

Kevin Mixon was a security guard at the Safeway market at College Avenue and Claremont in Oakland (see counts 28 and 29). On August 25, 2006, at about 3:00 a.m., Mixon was standing near the front door when a man entered, pointed a pistol at him, and told him to "freeze." The gunman wore a black mask, and was tall and lanky. The gunman was with two people who also wore masks: a petite woman and a slender man who was shorter than the first man. Mixon believed that all three were White.

Mixon punched the gunman and tried to disarm him. The girl hit Mixon over the head with a plastic bucket-like value used by the store to hold beans. The gunman was able to break free and all three fled. Mixon pursued them, first on foot and then in his car. He saw the people run to a white Honda which he tried to follow. He found the Honda around a corner, abandoned with the motor still running, with no keys in the ignition and the ignition broken. As Mixon drove back to the Safeway, he saw a green Honda driving toward him. The shorter of the two men who had fled from the store was driving. He had curly hair and was between 19 and 22 years old. Mixon turned to pursue the car, but found it also abandoned in a dead-end street. The ignition had been removed.

Carrington testified that he, Melissa, and Ray III were involved in this incident. Ray III also described these events in his statement to police. He said that he had been tackled by the security guard, and that he, Carrington and Melissa had stolen two Honda Civics.

*Count 1-Robbery of Ved Goyal at the 7-Eleven Store on 2411 MacArthur Boulevard in Oakland on August 27, 2006 [Ray Jr. and Ray III]*

On August 27, 2006, at about 12:55 a.m., Ved Goyal and Mangit Singh were working at the 7-Eleven store at 2411 MacArthur Boulevard, Oakland. Two men entered the store wearing masks. One grabbed Goyal and took him toward the cash register. Singh described one man as taller, about six feet tall, and the other as shorter, about five feet seven inches or five feet eight inches tall. Singh thought the taller man was Black, and the shorter man was White. The taller man had a gun and demanded that Goyal open the register. The two men took the cash tray from the register and put it in a bag. The men also took a set of keys, and the man with the gun took a carton of cigarettes. The men ran to a car parked sideways in the parking lot.

Oakland Police Officer Christopher Saunders was driving past the 7-Eleven store at about 12:55a.m., when he saw three men run from the store, one with his hands up. Two of the men ran to a green Honda Civic in the middle of the store's parking lot. One had a red bandana over his face and the other wore a blue and black windbreaker jacket with the hood pulled up. Both were White. Saunders ordered the men to stop at gunpoint, but they entered the car and fled from the scene with the officer in pursuit.

After a high speed chase for about four miles, Saunders was able to force the Honda into a spin on East 12th Street, near Third Avenue. Ray Jr. was removed from the driver's seat and

12

Ray III from the passenger seat.  Saunders had to break open the passenger window to forcibly remove Ray III from the vehicle.  Ray Jr. resisted arrest and officers used a Taser to subdue him.  Ray Jr. was photographed wearing a dark blue shirt with an Oakland Raiders logo, and Ray III was wearing a blue and black hooded jacket.  Ray Jr. was wearing gardening gloves on both hands when arrested.

The cash register drawer with money was on the back seat of the Honda, and a carton of cigarettes was on the front passenger floorboard.  A red bandana was found between the driver's seat and the door.  Also recovered from the car were gloves, a beanie cap with an Oakland Raiders logo, and a plastic toy gun with a portion of the butt broken.  The ignition on the steering column of the vehicle had been punched out.

*Search of the Ray's Recreational Vehicle*

Acting on information provided by Ray Jr. following his arrest, a white RV/van with a stripe on the side belonging to the Ray family was located at 65th Street and Telegraph Avenue in Oakland in the early morning hours of August 27, 2006.  Ray Jr.'s wife, Tina Ray, Melissa and a younger daughter were contacted in the RV.  A search warrant for the RV was obtained, and police recovered camouflage pants, gloves, a box for a replica handgun with a laser sight, black baseball caps with Raider emblems, and computer printouts and hand-written notes and diagrams on how to hotwire vehicles.  A Honda Civic with a punched ignition was located less than a block away from the RV.

*Ray III's Statements to Police.*

As discussed above, Ray III gave a statement in which he admitted involvement in the series of robberies.  He said that he typically wore a hat and a bandana in the robberies, and frequently wore a hoodie and gloves.  He said that toy guns were usually used, and denied using a real gun.  He admitted, however, that there was a single barrel shotgun with a pistol grip that "maybe" was used in one of the robberies.  On the day of the last 7-Eleven robbery he had stolen two Honda Civics, as he usually did.  Melissa was waiting in the second stolen Honda one street away.

*Ray Jr.'s Statements to Police*

While being transported to the hospital after being tasered during his arrest, Ray Jr. said to the transporting officer "[a]ll you got me on is a 211" and "I know who you're looking for.  I read the papers.  You guys have been betting on who is going to get us."  During the ride to the hospital, Ray Jr. had removed the gloves he had been wearing, and they were found in the rear seat of the patrol car.  When transported that same evening from the hospital to the police station, Ray Jr. said "I know I'm a bad example for a father.  I'm worried about my son for getting him involved.  I know this is a bad one.  How much time do you think I'll get for this one?"

Ray Jr. was interviewed by detectives on August 27, 2006, at 10:57 p.m.  He said that he lived in the RV with his wife and three children, including Ray III and Melissa.  In the recorded portion of the interview, he admitted committing the 7-Eleven robbery for which he had been apprehended, saying that he had entered the store wearing his black Raider's shirt and a red "scarf" on his face, carrying a toy gun, and that he "went for" the register.  After the recording was turned off, he further stated that he was responsible for some, but not all of the other robberies, that "people" in an area where he used to live on Pearl Street in Oakland were "framing" him, and that he had an alibi.

*Evidence of Ray Jr.'s Post-Arrest Conduct*

13

United States District Court

For the Northern District of California

1
2
3

On February 21, 2007, prior to his trial testimony, Carrington was inadvertently placed in a holding cell with Ray Jr. and other inmates. Ray Jr. told other inmates that Carrington was "snitching" and as a result, Carrington was assaulted by another inmate. Ray Jr. told Carrington not to testify.

4
5
6

At the time of the preliminary hearing on November 1, 2006, Ray Jr. was searched and a note was found in his sock. The note, which was read to the jury during cross-examination of Ray Jr. at trial, appeared to be directed to Ray III: suggesting that Ray III confess; promising money to Ray III if he got out; and saying, "If you do take this, I will owe you forever." Ray Jr. denied writing or reading the letter, and said that someone had handed it to him on the prison bus.

7

*Ray Jr.'s Trial Testimony.*

8
9
10
11
12
13
14

Ray Jr. testified, denying involvement in any of the robberies, including the 7-Eleven robbery where he was arrested fleeing the scene. He said that he went to the 7-Eleven that night to pick up Melissa. Melissa jumped into the car with a brown paper bag. Ray Jr. started to enter the store when Carrington almost knocked him down running out. He and Ray III then ran to the car and he fled from the police because he knew the car that they were driving was stolen. Melissa and Carrington fled separately. He denied having the toy gun found in his car, said that he was wearing a bandana around his neck (and not on his face) because it was "chilly," and said that the garden gloves he was wearing were his "driving gloves." He denied confessing to the robbery, and said that he had not mentioned Carrington to police after his arrest because Carrington was at large and he feared for his family. He insisted ". . . as I [have] stated numerous times[,] I'm a law abiding citizen. I have no prior offenses. . . . I've never been convicted of any drug offense or anything. I had a minor alcohol problem which I have canned by taking classes. Other than that, I don't have a record." . . .

15

*The Verdicts*

16
17
18
19
20

Two charged counts against Ray Jr. and Ray III (counts 10 & 21) were dismissed by the court on the District Attorney's motion at the close of the prosecution evidence (§ 1118.1). On March 20, 2007, . . . [t]he jury found Ray III guilty of all remaining 29 counts of second degree robbery (§ 211), and one count of attempted robbery (§§ 664, 211). On the charge of assault with a deadly weapon (count 33), the jury found Ray III guilty of the lesser included offense of simple assault (§ 240). The allegations that Ray III was armed with a firearm during eight of these offenses (§ 12022, subd. (a)(1); counts 2-3, 16-17, 22-23, 26-27) and that he used a deadly weapon (a knife and a crowbar) in the commission of another (§ 12022, subd. (b)(1); count 4) were found by the jury to be true.

21

*Sentencing*

22

. . .

23
24
25
26

On April 24, 2007, Ray III was certified to the juvenile court pursuant to Welfare and Institutions Code section 604 for a fitness determination on counts 2 and 3, due to his minority at the time of both offenses. Following remand, the court referred Ray III for a 90-day diagnostic evaluation pursuant to section 1203.03. After receipt of the report from the Department of Corrections, Ray III was sentenced on October 5, 2007, to an aggregate term of eight years in state prison. His timely notice of appeal was filed on October 30, 2007.

27

Resp. Exh. A at 3-23 (footnotes omitted).

28

14

**United States District Court**
For the Northern District of California

**STANDARD OF REVIEW**

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of section 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

United States District Court

For the Northern District of California

Even if constitutional error is established, habeas relief is warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson, 532 U.S. 782, 795-96 (2001) (*quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000). Thus, a federal court will "look through" the unexplained orders of the state courts rejecting a petitioner's claims and analyze whether the last reasoned opinion of the state court unreasonably applied Supreme Court precedent. *See Ylst,* 501 U.S. at 804-06. However, when presented with a state court decision that is unaccompanied by a rationale for its conclusions, a federal court must conduct an independent review of the record to determine whether the state-court decision is objectively unreasonable. *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). This review is not a "de novo review of the constitutional issue;" rather, it is the only way a federal court can determine whether a state-court decision is objectively unreasonable where the state court is silent. *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

## DISCUSSION

As grounds for federal habeas relief, Petitioner asserts the following claims:[2] (1) his Sixth Amendment right to counsel was violated when police held a lineup at which counsel was not present; (2) his Sixth Amendment right to a speedy trial was violated because he was not arraigned within fifteen days of being held to answer; (3) his Sixth Amendment right to effective appellate counsel was violated because appellate counsel did not file a petition for review in the California Supreme Court; (4) his confession was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966); (5) the prosecutor suppressed exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (6) his Sixth Amendment right to confront and cross-examine witnesses was violated because the victims of the robberies in Counts 1, 3, 4, 6, 9 and 19 did not testify at his trial; (7) the trial court's use of modified CALCRIM No. 3515 over his objection violated his right to due process;

_____

[2]Petitioner presents the same claims in his original petition, doc. no. 1, and in his "amended petition," doc. no. 70.

16

**United States District Court**
For the Northern District of California

1  (8) the appellate court violated his due process rights by ignoring the record and changing the

2  testimony of a victim and an eye-witness; (9) the prosecutor committed misconduct; (10) trial counsel

3  was ineffective; (11) the evidence was insufficient to support his identification on all counts.

4  **I. Procedural Default**

5     Respondent argues that all claims, with the exception of claims 4 and 5, the *Miranda* and

6  *Brady* claims, are procedurally defaulted.  Procedural default refers to the fact that, on habeas review,

7  a federal court will not review questions of federal law decided by a state court if the decision rests

8  on a state law ground that is independent of the federal question and adequate to support the

9  judgment. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).

10     **A. Claim 7**

11     Respondent argues that claim 7, the instructional error claim, is procedurally defaulted

12  because the California Court of Appeal rejected it on the independent and adequate state ground that

13  the defense failed to object at trial to the allegedly defective instruction.

14     The California Court of Appeal did not address the merits of Petitioner's instructional error

15  claim because it found that, although counsel for Ray Jr. objected to the instruction in the trial court,

16  counsel for Petitioner did not.  Resp. Exh. A at 25.  Petitioner points out, however, at the beginning of

17  the trial his counsel asked to "be deemed to join in any objection that co-counsel makes, unless I

18  specifically say I'm not part of it so we don't have this, 'I object, and I object too.'"  Doc. no. 67,

19  Pet.'s Ex. 22 at 4-5.  The trial court agreed.  *Id.* at 5.  Thus, when Ray Jr.'s counsel objected to the

20  instruction Petitioner challenges in this petition, Petitioner's counsel joined in the objection, even if

21  he did not say so at the time.  The Court of Appeal's finding that Petitioner's counsel did not object

22  was an unreasonable determination of the facts.  This claim is not procedurally defaulted and will be

23  addressed on the merits.

24     **B. Claims 1-3, 6, and 8-11**

25     Next, Respondent argues that all other claims, with the exception of the *Miranda* and *Brady*

26  claims, are procedurally defaulted because the California Supreme Court rejected Petitioner's Second

27  Supreme Court Petition by citing *In re Clark,* which is an independent and adequate state ground.  *In*

28  *re Clark* stands for the proposition that, absent justification for a failure to present all known claims

17

United States District Court

For the Northern District of California

in a single, timely habeas petition, a successive petition will be denied. *Arroyo v. Curry*, 2009 WL 723877, at *5 (N.D. Cal. Mar. 18, 2009). Although the Ninth Circuit has not ruled on whether California's bar on successive petitions constitutes valid grounds for procedural default of federal claims, several district courts, in well-reasoned decisions have concluded that it does. *See e.g., Rutledge v. Katavich*, 2012 WL 2054975, *7 (N.D. Cal. June 5, 2012) (California's procedural rule against successive petitions bars federal habeas review) ; *Arroyo*, 2009 WL 723877, at *4-6. This Court adopts the reasoning of these decisions and finds that *In re Clark* constitutes an independent and adequate state procedural ground for the California Supreme Court's denial of Petitioner's claims, barring federal habeas review.

Petitioner argues that *In re Clark* does not apply because he raised these claims in a previous petition to the California Supreme Court.

The following is a summary of the complicated history of Petitioner's filings in the California Supreme Court. Petitioner filed a petition for review in the California Supreme Court, No. S179136, marked "Received on Feb. 10, 2010," *see* Doc 32-2, Resp's Ex. C. In this petition, Petitioner raised two claims: (1) instructional error; and (2) *Miranda* violation. Petitioner also filed what the Court has labeled Petitioner's First Supreme Court Petition, No. S179314, filed on January 8, 2010, *see* Doc. 32-2, Resp's Ex. D. In this petition, Petitioner raised three claims: (1) instructional error; (2) *Brady* violation; and (3) a request to file a petition he had filed on November 29, 2007 in the Superior Court, on which the Superior Court never ruled. In this third claim, Petitioner appeared to be attempting to incorporate by reference claims he presented to the Superior Court, but he did not attach the Superior Court petition or indicate the claims he allegedly asserted in it. On March 10, 2010, the California Supreme Court summarily denied this petition. On April 1, 2011, Petitioner filed what the Court has labeled Petitioner's Second Supreme Court Petition, which raised the eleven claims asserted in this petition. The California Supreme Court denied this petition pursuant to *In re Clark*. Thus, if these were the only petitions filed with the California Supreme Court, Petitioner's federal claims, with the exception of claims 4, 5, and 7, would be procedurally defaulted by the California Supreme Court's dismissal pursuant to *In re Clark*.

However, Petitioner claims that, on December 28, 2010, he mailed his first petition to the

California Supreme Court.  In support of this claim, Petitioner refers to his opposition to Respondent's motion to dismiss, *see* Doc. no. 35, where he submitted a copy of his legal mail log showing that he mailed a document to the California Supreme Court on December 28, 2010.  Doc. no. 35, Ex. 4.  He also attaches a copy of the petition he allegedly mailed to the Supreme Court.  Doc. no. 35, Ex. 8.  The petition is not marked "received," or "filed" by the California Supreme Court, and a case number does not appear on it.  Respondent argues that the California Supreme Court never received this petition because a printout of all cases in the Court involving Petitioner shows that no such petition was received or filed.

It appears that, although Petitioner may have mailed a petition on December 28, 2010, (hereinafter, "unnumbered petition"), the California Supreme Court did not receive, file or rule on it. Given that Petitioner mailed this petition during the Christmas holiday season, it may have gotten lost in the mail.  In the interests of justice, and giving Petitioner the benefit of the doubt, the Court will address the merits of the claims Petitioner raised in the unnumbered petition.  However, as discussed below, the claims not raised in the unnumbered petition are procedurally defaulted and will not be addressed on their merits.

A review of the unnumbered petition shows that Petitioner asserted six claims that he also raises in this federal petition: (1) federal claim 1, right to counsel violated when police held a lineup without counsel present; (2) federal claim 2, violation of right to a speedy trial; (3) federal claim 3, ineffective assistance of counsel on appeal for failure to file a petition for review; (4) federal claim 6, violation of right to confront witnesses; (5) federal claim 10, ineffective assistance of trial counsel; and (6) federal claim 11, insufficient evidence supporting Petitioner's identification.  The unnumbered petition did not contain federal claims 4, 5, 7, 8 and 9.  As previously explained, claims 4, 5 and 7 are not procedurally defaulted.  Therefore only federal claim 8, the Court of Appeal changed testimony of witnesses, and federal claim 9, prosecutorial misconduct, are defaulted by the California Supreme Court's dismissal pursuant to *In re Clark.*

A claim may be excepted from procedural default where a petitioner shows cause and prejudice for the default or a fundamental miscarriage of justice will result from the failure to consider the claim.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  The cause standard requires a

United States District Court

For the Northern District of California

petitioner to show some objective factor external to the defense impeded his efforts to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Objective factors that constitute cause include interference by officials that makes compliance with the procedural rule impractical. *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991). The "miscarriage of justice" exception, when applied to habeas petitioners, requires a showing that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

In his traverse, Petitioner argues that it is unnecessary for him to show cause and prejudice because his claims are not procedurally defaulted and because appellate counsel was ineffective for failing to raise his claims on direct appeal. As discussed below, Petitioner's claim of ineffectiveness of appellate counsel lacks merit and, in any event, is insufficient to establish cause. Petitioner conclusorily states that a failure to address his claims would result in a miscarriage of justice, but does not elaborate on this argument. This conclusory statement is insufficient to show actual innocence. Petitioner's failure to show cause and prejudice or actual innocence means that claims 8 and 9 are procedurally defaulted and habeas review is barred. The Court now turns to the merits of the nine claims that are either non-defaulted or were presented in the unnumbered petition.

## II. Petitioner's Claims

In addressing claims 1-3, 6, 7, 10 and 11, where there is no reasoned state court opinion, the Court conducts an independent review of the record to determine whether the state court decision was objectively unreasonable. *See Delgado*, 223 F.3d at 982. However, because the California Court of Appeal denied claims 4 and 5 in a reasoned opinion, the Court reviews that opinion to determine if it was contrary to or an unreasonable application of Supreme Court authority or an unreasonable determination of the facts based on the state court record. *See* 28 U.S.C. § 2254(d). The Court addresses each claim in numerical order.

### A. Claim 1 – Lineup Without Counsel Present

Petitioner claims that his Sixth Amendment right to counsel was violated when police held and videotaped a lineup that included him without his counsel present.

A defendant has a right to counsel at a post-indictment lineup because it is a critical stage of

United States District Court

For the Northern District of California

the prosecution. *United States v. Wade*, 388 U.S. 218, 236-37 (1967).  The admission of testimony of a witness who identified the defendant at a lineup conducted without defense counsel being present is per se inadmissible.  *Gilbert v. California*, 388 U.S. 263,  272-73 (1967).  However, the admission of identifications at tainted lineups is subject to harmless error analysis.  *Id.* at 274; *Wade*, 388 U.S. at 242.

Respondent concedes that, from the record, it cannot be shown that counsel was present at Petitioner's lineup.  The Court, then, assumes counsel was not present.  Although, in his Amended Petition, Petitioner does not identify a witness who testified to identifying him at the pretrial lineup, Respondent points out that, in regard to Count 29, Nicole Johnson testified that she chose Petitioner in a lineup as possibly the person who robbed her.  Reporter's Transcript ("RT") at 722; 730-32.

Pursuant to *Gilbert*, 388 U.S. at  272-73, the trial court committed constitutional error by admitting Johnson's identification testimony.  However, to warrant habeas relief, Petitioner must show that he was prejudiced by it.  *See Brecht*, 507 U.S. at 638 (habeas relief warranted only if constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict.").

In his traverse, Petitioner argues Johnson's testimony was prejudicial because the prosecutor led the jury to believe that she positively identified him at the lineup.  Trav. at 40.  However, Petitioner fails to support this argument with citations to the record.  A review of the prosecutor's closing argument reveals no reference to Johnson's identification.  Moreover, as discussed below in regard to Petitioner's claim of insubstantial evidence, Claim 11, the evidence of Johnson's equivocal identification was unimportant because, even had she not testified about identifying Petitioner, substantial evidence supported the jury's finding that Petitioner was guilty of all counts.

Petitioner has not shown that Johnson's testimony of her tentative identification of Petitioner at the lineup caused a substantial and injurious effect or influence in determining the jury's verdict. The state court's denial of this claim was not objectively unreasonable.

**B. Claim 2 – Speedy Trial**

Petitioner argues that the state violated his Sixth Amendment right to a speedy trial when it failed to arraign him within fifteen days after he was held to answer.  In his amended petition,

United States District Court

For the Northern District of California

1    Petitioner explains that he was held to answer on November 6, 2006, arraignment was set for

2    November 21, 2006, but he was not arraigned until November 27, 2006.

3        "Because the Sixth Amendment guarantees the right to a speedy trial and not a speedy

4    arraignment, any delay in arraignment is constitutionally relevant under the Sixth Amendment only as

5    it bears on a petitioner's right to a speedy trial. *Clay v. Sisto*, 2010 WL 4923143, *8 (C.D. Cal. Oct.

6    25, 2010).  To determine if an accused's Sixth Amendment right to a speedy trial has been violated,

7    the court must look to (1) the length of the delay; (2) the reason for the delay;  (3) assertion of the

8    right by the defendant; and (4) prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530

9    (1972); *Doggett v. United States*, 505 U.S. 647, 651-52 (1992); *United States v. Williams*, 782 F.2d

10   1462, 1465 (9th Cir.1985).  The threshold inquiry is whether the alleged delay was presumptively

11   prejudicial, otherwise no need exists to inquire into the other factors. *Doggett*, 505 U.S. at 651

12   (citing *Barker*, 407 U.S. at 530).

13       In *Doggett*, the Supreme Court noted that courts have generally found post-accusation delay

14   "presumptively prejudicial" if it approaches one year. *Doggett*, 505 U.S. at 652 n.1.  The Ninth

15   Circuit has determined that a six-month delay, though not very long, is a borderline case, sufficient to

16   trigger inquiry into the remaining three *Barker* factors. *United States v. Valentine*, 783 F.2d 1413,

17   1417 (9th Cir. 1986); *see also United States v. Simmons*, 536 F.2d 827, 831 (9th Cir. 1976) (same).

18   However, the Ninth Circuit has held that a four-month delay is insufficient for a Sixth Amendment

19   violation. *United States v. Turner*, 926 F.2d 883, 889 (9th Cir. 1991).

20       Under the above Ninth Circuit authority, a six-day delay of Petitioner's arraignment, from

21   November 21 to November 27, 2006, is insufficient to be considered "presumptively prejudicial" and

22   there is no necessity for inquiry into other factors.   The state court's rejection of this claim was not

23   objectively unreasonable.

24       **C. Claim 3 – Ineffective Assistance of Appellate Counsel**

25       Petitioner claims his Sixth Amendment right to counsel was violated because his appellate

26   counsel abandoned him before filing a petition for review in the California Supreme Court and

27   prevented him from filing a petition for review by not immediately returning his legal documents.

28       The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the

United States District Court

For the Northern District of California

effective assistance of counsel on his first appeal as of right. *Evicts v. Luce*, 469 U.S. 387, 391-405 (1985). However, a defendant does not have a constitutional right to appointed counsel on a discretionary appeal to the state supreme court. *Wainwright v. Torna*, 455 U.S. 586, 587-88 (1982); *Ross v. Moffitt*, 417 U.S. 600, 610-12 (1974). Because there is no right to counsel at the discretionary appeal level, there is no corresponding right to effective assistance of appellate counsel. *Torna*, 455 U.S. at 587-88; *Miller v. Keeney*, 882 F.2d 1428, 1432 (9th Cir. 1989). Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Moormann v. Ryan*, 628 F.3d 1101, 1106 (9th Cir. 2010). The petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue. *Smith*, 528 U.S. at 285; *Moormann*, 628 F.3d at 1106. The petitioner also must show prejudice, which in this context requires the petitioner to demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal. *Smith*, 528 U.S. at 285-86; *Moormann*, 628 F.3d at 1106.

Petitioner's claim based on appellate counsel's failure to file a petition for review in the California Supreme Court is not cognizable because he has no right to counsel or to effective assistance of counsel beyond his first appeal as of right. Petitioner's claim premised on appellate counsel's preventing him from filing a petition for review fails because Petitioner himself filed a petition for review. Moreover, Petitioner's appellate counsel sent him a letter dated December 4, 2009, (Doc. no. 70-2 at 40-41), twelve days after the Court of Appeal's decision, in which she provided him notice of when and how he could file a petition for review himself, together with a box containing the transcripts used in his appeal. *See Canales v. Roe*, 151 F.3d 1226, 1231 (9th Cir. 1998) (counsel's failure to file a timely notice of appeal may not constitute ineffective assistance of counsel where the petitioner is advised that no timely notice has been filed and how to proceed to perfect a late appeal and nonetheless does not act on this advice in a timely manner). Therefore, Petitioner fails to establish deficient performance on the part of appellate counsel or prejudice as a result of the alleged deficient performance.

**United States District Court**
For the Northern District of California

Petitioner also claims appellate counsel should have filed a petition for a writ of habeas corpus in state court.  This claims fails because no Sixth Amendment right to counsel exists in habeas proceedings.  *See Knaubert v. Goldsmith*, 791 F.2d 722, 728 (9th Cir. 1986).

Finally, Petitioner faults appellate counsel for not including his federal habeas claims in his direct appeal to the Court of Appeal.  However, appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by a defendant.  *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997); *Miller*, 882 F.2d at 1434 n.10. The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.  *Id.* at 1434.  Because all of Petitioner's federal habeas claims are denied, appellate counsel was not ineffective for determining that Petitioner had no further meritorious claims to include in his direct appeal.

The state court's denial of the claim of ineffective assistance of appellate counsel was not objectively unreasonable.

**D. Claim 4 – *Miranda* Violation**

Petitioner claims that the police illegally obtained a confession from him by ignoring his requests to speak to a lawyer and to his family.  He also contends that his statement to the police was involuntary.

**1. Federal Authority**

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that certain warnings must be given before a suspect's statement made during a custodial interrogation can be admitted in evidence.  *Miranda* requires that a person subjected to custodial interrogation be advised that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *Id.* at 444.  The warnings must precede any custodial interrogation, which occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action.  *Id.*

Once properly advised of his rights, an accused may waive them voluntarily, knowingly and intelligently.  *Id.* at 475.  The distinction between a claim that a *Miranda* waiver was not voluntary, and a claim that such waiver was not knowing and intelligent is important.  *Cox v. Del Papa*, 542

F.3d 669, 675 (9th Cir. 2008).  The voluntariness component turns on the absence of police

overreaching, i.e., external factors, whereas the cognitive component depends upon the defendant's

mental capacity.  *Id.*

A valid waiver of Miranda rights depends upon the totality of the circumstances, including the

background, experience and conduct of the defendant.  *United States v. Bernard S.*, 795 F.2d 749,

751 (9th Cir. 1986).  In the case of juveniles, this includes evaluation of the juvenile's age,

experience, education, background and intelligence, and whether the juvenile has the capacity to

understand the warnings given him, the nature of his Fifth Amendment rights and the consequences

of waiving those rights.  *Juan H. v. Allen*, 408 F.3d 1262, 1271 (9th Cir. 2005).  "Where the

prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an

accused's uncoerced statement establishes an implied waiver of the right to remain silent."  *Berghuis*

*v. Thompkins*, 130 S. Ct. 2250, 2261-62 (2010).  The law presumes that an individual who fully

understands their rights and acts in a manner inconsistent with them has made "a deliberate choice to

relinquish the protection those rights afford."  *Id.* at 2262 (citations omitted).  The government must

prove voluntariness by a preponderance of the evidence.  *Colorado v. Connelly*, 479 U.S. 157, 168-69

(1986).

The requirements of *Miranda* are "clearly established" federal law for purposes of federal

habeas corpus review under 28 U.S.C. § 2254(d).  *Juan H.*, 408 F.3d at 1271 (9th Cir. 2005).  The

ultimate question of whether a waiver of *Miranda* rights is voluntary is a legal question which this

Court resolves independently.  *Miller v. Fenton*, 474 U.S. 104, 115 (1985).  However, the state

court's determination of the underlying facts is entitled to a presumption of correctness.  *Id.* at 117.

### 2. Court of Appeal Opinion

The California Court of Appeal rejected this claim as follows:

When a defendant challenges his or her statements as involuntary, the prosecution bears the
burden of proving voluntariness by a preponderance of the evidence. (*Lego v. Twomey* (1972)
404 U.S. 477, 489; *People v. Guerra* (2006) 37 Cal. 4th 1067, 1093, *disapproved on other
grounds in People v. Rundle* (2008) 43 Cal. 4th 76, 151.)  "[W]e review independently the
trial court's legal determinations of whether a defendant's statements were voluntary [citation].
. . . We evaluate the trial court's factual findings regarding the circumstances surrounding the
defendant's statements and waivers, and "'accept the trial court's resolution of disputed facts
and inferences, and its evaluations of credibility, if supported by substantial evidence.'"
(*People v. Rundle*, 43 Cal. 4th at 115, *disapproved on another ground in People v. Doolin,
supra*, 45 Cal . 4th at 421, fn. 22.)  "We make the same inquiry to determine the voluntariness

25

1   of a *Miranda* waiver. (*Colorado v. Connelly* (1986) 479 U.S. 157, 169-170 [parenthetical omitted].)" (*Guerra*, 37 Cal.4th at 1093.)

A statement is involuntary if it is not "the product of a rational intellect and a free will." [Citations.] (*Mincey v.. Arizona* (1978) 437 U.S. 385, 398.) "The due process [voluntariness] test takes into consideration 'the totality of all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation.'" (*Dickerson v. United States* (2000) 530 U.S. 428, 434 [quoting *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226].)

Ray III contends that his statements were involuntary because investigating officers ignored his request for counsel and his initial refusal to speak with them, and that he agreed to speak only when the officers threatened that his youngest sister would be sent to Child Protective Services if he did not. The trial court found the statements to be voluntary, as do we.

The trial court held an evidentiary hearing on Ray III's motion on January 23 and January 24, 2007. Oakland Police Department Sergeant George Phillips testified about the circumstances of Ray III's interrogation. Ray III was arrested on August 27, 2006, at about 2:30 a.m., and was taken to the police department at about 4:00 a.m., after being treated at the hospital for facial abrasions suffered during his arrest. The interview, at which Oakland Police Sergeant Basa and Alameda Police Sergeant Owyang were also present, commenced at about 7:07 p.m. and concluded at approximately 9:05 p.m.

On the initial issue of compliance with *Miranda* requirements, Phillips testified that he read Ray III his *Miranda* rights at 7:16 p.m., using a preprinted form. Ray III initialed and dated the form, confirming his willingness to waive counsel and speak with the investigators. The officers began the recorded portion of the interview at 7:54 p.m. Phillips again advised Ray III of his rights under *Miranda*. Ray III confirmed the earlier admonition and again waived his right to counsel, signing the statement form.

Testifying on his own behalf, Ray III claimed that he initially asked Phillips if he could talk to a lawyer, and that Phillips told him that he "didn't need one, it was just an interview." Phillips unequivocally denied that this occurred. The trial court found Ray III's testimony unpersuasive and accepted the officer's testimony, finding "nothing wrong with those admonitions or the waivers entered on those admonitions." Ray III argues here that the officer's testimony was not credible, suggesting the fact that there were discussions between him and the investigating officers preceding the recording of his statements renders the officer's testimony inherently suspect. He ignores the fact that it is the trial court, which had the opportunity to observe both witnesses and to listen to the recording of the interview, that makes such credibility findings. *(See People v. Rundle*, 43 Cal.4th at 115.)

On the broader issue of voluntariness, Ray III insists that the totality of circumstances reflect that he was "psychologically coerced" into making incriminating statements. He points to his confinement in a police interview room for several hours before the interview commenced, his evident fatigue toward the end of the interview, alleged police deception in falsely telling Ray III that the officers had already interviewed Ray Jr., and purportedly telling Ray III that his mother and youngest sister were in police custody. He further emphasizes his young age, limited education, and minimal prior contacts with the criminal justice system.

Phillips testified that Ray III was not agitated, was cooperative and conversational throughout the interview, and began to "fatigue somewhat" only toward the end of the session. Ray III testified only that he was "tired a little bit." A log, reflecting appellant's activities and condition while waiting in the interview room, was introduced in evidence. It indicated that police personnel checked on appellant's condition about every half-hour, that he slept, was given bathroom breaks, and was given food and water. When asked at the hearing if he was feeling any effects from his injury following the police chase during his interview, Ray III's

26

only complaint was that "My face was kind of numb. . . ."  A photograph of Ray III, taken two days later, showed the condition of his face at that time.  Phillips testified that, while he could observe scratches on appellant's face, Ray III never complained of pain.

As noted above, Ray III testified that Basa told him that his mother was in custody, and that his sister would be sent to "child protective custody" unless he agreed to give a statement.  Phillips expressly denied that this occurred.  He testified that no promises and no threats were made to Ray III.

The court in making a voluntariness determination "examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession. [Citation.]"  (*Dickerson*, s530 U.S. at 434.)  The question of whether the authorities improperly coerced a defendant's statements involves an evaluation of the totality of the circumstances, including the nature of the interrogation and the circumstances relating to the particular defendant.  (*Ibid.*)

In finding appellant's statements to have been given voluntarily, the court found that "[t]o the question of under the Sixth Amendment as to Mr. Ray, III, as to whether or not his will was overborne by any improper behavior or threat or benefit pursuant to his testimony, I'll find that within the meaning of the federal authorities his will was not overborne as evidenced by the taped statement that he did give which shows that he admitted some things and did not admit to other things.  In other words, he was able to make rational choices and appeared to answer each and every question asked of him rationally so the motion to suppress statements as to Mr. Ray, III is denied."

A finding of involuntariness must be predicated on coercive police activity.  (*Colorado v. Connelly*, 479 U.S. at 169-170; *People v. Maury*, 30 Cal. 4th at 404.)  Such coercion may take the form of physical violence, verbal threats, direct or implied promises of leniency or other rewards, or any other improper influence.  (*People v. Benson* (1990) 52 Cal. 3d 754, 778.)  The fundamental question is whether the coercive activity proximately caused defendant's will to be overborne.  (*People v. Jones* (1998) 17 Cal. 4th 279, 296.)

Appellant also contends that his statement was the product of deception by police in falsely claiming that Ray III's father, Ray Jr., had been interrogated before Ray III.  Although false statements made by the police during questioning may affect the voluntariness of a defendant's confession, they are not per se sufficient to make it involuntary.  (*People v. Farnam* (2002) 28 Cal. 4th 107, 182.)  "A finding of involuntariness is unwarranted if the deception is not of a type reasonably likely to produce a false statement."  (*Guerra*, 37 Cal.4th at 1097 [citing *Farnam*, at 182].)  No claim was made by the officers that Ray Jr. had in any way implicated Ray III, and simply claiming that a statement had been taken from the father is not a deception of "a type reasonably likely to produce a false statement."

We likewise find that the totality of circumstances does not reflect impermissibly coercive police activity, the statements given by appellant were voluntary and the motion was properly denied.

Resp. Exh. A at 35-39 (footnotes omitted).

### 3. Analysis

At the evidentiary hearing on Petitioner's motion in limine to exclude his confession, testimony was given by Sergeant George Phillips, the officer who interviewed Petitioner, and by Petitioner.  The testimony of these witnesses conflicted on several key issues.  Petitioner stated that,

during the first part of the interview, before Sgt. Phillips turned on the tape recorder, Petitioner said that he would not talk to the officers, but then an officer told him that the police had his mother in custody and that they would send his sister to child protective custody "unless I didn't talk to him." RT at 107.  Petitioner testified that he asked Sgt. Phillips "if I could talk to a lawyer and he told me that I didn't need one, it was just an interview."  RT at 108.  Then Petitioner admitted his involvement in most, but not all, of the robberies brought up by Sgt. Phillips.  *Id.*

Sgt. Phillips testified to the following.  The police interview lasted approximately two hours, with the last seventy-five minutes tape-recorded.  Sgt. Phillips began the interview by asking Petitioner background information such as his name, address and family members and then gave Petitioner the *Miranda* admonishment.  RT at 27-29.   Petitioner agreed to waive his *Miranda* rights and signed the waiver form.  RT 29-30.  Sgt. Phillips began talking about the robbery for which Petitioner just had been apprehended and Petitioner admitted he committed that robbery.  RT at 31.  Sgt. Phillips then told Petitioner that he had spoken to Petitioner's sister and father and that he knew the details of other robberies Petitioner had committed.  RT at 31.  At that point, Sgt. Phillips had spoken with Petitioner's sister, but had not spoken with his father.  RT at 32.  Petitioner then admitted to being involved in the majority of robberies Sgt. Phillips questioned him about, but did not admit to being involved with three of them.  RT at 32.  Sgt. Phillips never threatened Petitioner or promised him anything for his confession.  RT at 34.  After Petitioner discussed his involvement in about half of the robberies in detail, Sgt. Phillips decided to "go on tape," and gave Petitioner the *Miranda* admonishment a second time.  Petitioner signed the *Miranda* waiver a second time and then discussed all the robberies on tape.  RT at 35.  Sgt. Phillips described Petitioner's demeanor during the interview as calm, cooperative and conversational.  RT at 37.  Sgt. Phillips testified that Petitioner never asked for a lawyer, and no one threatened that his sister would go to child protective services if he did not admit involvement in the robberies.  RT at 76.

After hearing this conflicting testimony, the trial court found Petitioner's testimony unpersuasive and accepted Sgt. Phillips' testimony.  RT at 128.  The Court of Appeal, in a well-reasoned opinion, accepted the trial court's credibility determination.  Resp. Ex. A at 37.

Petitioner first argues that the state court improperly shifted the burden of proving

United States District Court

For the Northern District of California

voluntariness from the prosecutor to himself.  The trial court stated:

> As to the question as to resolving the credibility question as to whether an invocation was made by Mr. Ray, III, after an admonition that Sergeant Phillips denied was given at the time, I would find that *as the moving party*, there's not been sufficient evidence to convince me by a preponderance of the evidence that that happened in the face of the contrary testimony by Sergeant Phillips.

RT at 128 (emphasis added).

From the trial court's statement, it appears to have placed the burden on Petitioner for proving the underlying factual issue of credibilty, not on the issue of voluntariness.  In any event, whether the trial court placed the burden of proving voluntariness on Petitioner is not relevant on habeas review where this Court independently must decide the issue. *See Miller*, 474 U.S. at 115.

Regarding credibilty, this Court sees no reason to disturb the state court's underlying finding that Sgt. Phillips was the more credible witness because the trial court, in viewing the demeanor of both witnesses, was in the best position to make that determination.  *See Miller*, 474 U.S. at 115 (state court's determination of facts underlying *Miranda* claim entitled to presumption of correctness).                In regard to voluntariness, the fact that Petitioner made rational choices, feeling  free to admit to some of the robberies, but not to others, is strong evidence that his will was not overborne by the officers and his confession was voluntary.  Nevertheless, Petitioner argues that the state court failed to consider that he was only eighteen years old at the time of the police interview, that he was distraught and was especially susceptible to police psychological coercion. Traverse at 47-48.  However, the record does not show that Petitioner was distraught.  Sgt. Phillips testified that Petitioner was calm and cooperative during the interview.  At the hearing on the motion to exclude Petitioner's confession, his attorney asked Petitioner how he was feeling at the beginning of the police interview and Petitioner responded only that his face was kind of numb and he was "tired a little bit."  RT at 106.  Furthermore, Petitioner's age, alone, is not sufficient for a finding of involuntariness. *See Yarborough v. Alvarado*, 541 U.S. 652, 2151-52 (2004) (state court's failure to consider age of suspect is not a proper basis for concluding state decision unreasonably applied clearly established federal law) (plurality opinion); *Juan H.*, 408 F.3d at 1273 (finding confession of 15-year-old suspect voluntary where police had misrepresented the serious potential legal consequences the suspect would face were he to admit involvement in the crime; even though suspect

United States District Court

For the Northern District of California

confessed after police trickery, interrogators' tactics were not sufficiently coercive to render the confession involuntary); *Fare v. Michael C.*, 442 U.S. 707, 727 (1979) (no coercion where police questioned 16 ½ year old who had been arrested several times previously).

For the first time in his traverse, Petitioner argues that the officers falsely suggested they had other evidence against Petitioner and "misrepresented the legal consequences of his statements to the point that he could not make a knowing and intelligent decision to waive his rights."  Traverse at 47. It appears that Petitioner did not make this argument to the trial court or the Court of Appeal and points to no evidence that officers made these misrepresentations.  The record shows the only misrepresentation made to Petitioner was Sgt. Phillips' statement that he spoke to Petitioner's father before he talked to Petitioner.  As pointed out by the Court of Appeal, the officers did not say that Petitioner's father had implicated Petitioner and, merely stating that they had taken a statement from the father is not the type of deception that is reasonably likely to produce a false statement.  *See e.g., Ortiz v. Uribe*, 671 F.3d 863, 868 (9th Cir. 2011) (police deception alone does not render a confession involuntary); *United States v. Haswood*, 350 F.3d 1024, 1029 (9th Cir. 2003) (not coercive to recite potential penalties or sentences, including potential penalties for lying to the interviewer).  Petitioner fails to point to any evidence showing that he did not understand the *Miranda* warnings or the consequences of waiving them.

Petitioner argues that his right to confront and cross examine witnesses was violated when Sgt. Phillips failed to testify at his trial and the trial court allowed the transcript of the interrogation to be read to the jury.

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI.  The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  *Crawford v. Washington*, 541 U.S. 36, 61 (2004).  It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.  *Id.*  The Confrontation Clause applies to all out-of-court testimonial statements offered for the truth of the matter asserted, i.e., "testimonial hearsay."  *Id.* at 51.

The Confrontation Clause does not apply to Sgt. Phillips' statements and questions during

Petitioner's interrogation because they were introduced at trial, not for the truth of what Sgt. Phillips said, but to give context to Petitioner's statements.  As such, Sgt. Phillips' statements and questions were neither testimonial nor hearsay.  *See United States v. Mitchell*, 502 F.3d 931, 966 (9th Cir. 2007) (no Confrontation Clause violation in introduction of information officer received from eyewitness absent at trial; information was non-hearsay because it was offered to show the basis for the officer's action, not for its truth).  Thus, the admission of Sgt. Phillips' statements did not violate Petitioner's confrontation rights.

In sum, the Court does not disturb the presumption of correctness applied to the state court's determination of credibility and, in its independent review of the record, the Court concludes that Petitioner's statements were voluntary.  Habeas relief on this claim is denied.

### E. Claim 5 – *Brady* Violation

Petitioner argues that the prosecution violated his Constitutional rights, as established in *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose to the defense evidence of a robbery at the Ed-Green Market in Oakland, committed on February 24, 2007, after Petitioner was taken into custody.

#### 1. Federal Authority

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.  The duty to disclose such evidence applies even when there has been no request by the accused, *see United States v. Agurs*, 427 U.S. 97, 107 (1976), and that duty encompasses impeachment evidence as well as exculpatory evidence, *see United States v. Bagley*, 473 U.S. 667, 676 (1985).

There are three components to a *Brady* violation.  *Benn v. Lambert*, 283 F.3d 1040, 1052 (9th Cir. 2002).  First, the suppressed evidence must be favorable to the accused.  *Bagley*, 473 U.S. at 676 (1985) *(citing Brady*, 373 U.S. at 87).  Second, the evidence must have been suppressed by the government, either willfully or inadvertently.  *Agurs*, 427 U.S. at 110.  Third, the suppressed evidence must be material to the guilt or innocence of the defendant.  *Bagley*, 473 U.S. at 676-78.

Evidence is deemed prejudicial, or material, only if it undermines confidence in the outcome of the trial. *Id.* at 676. *Brady* has no good faith or inadvertence defense; whether nondisclosure was negligent or by design, it is the responsibility of the prosecutor. *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004). Moreover, the rule encompasses evidence "'known only to police investigators and not to the prosecutor.'" *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999) *(quoting Kyles v. Whitley,* 514 U.S. 419, 438 (1995)). In order to comply with *Brady,* therefore, "'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'" *Id. (quoting Kyles*, 514 U.S. at 437).

### 2. Analysis

Respondent assumes that police possessed evidence of the Ed-Green Market robbery, that the defense was unaware of the robbery and, if the evidence was material, the police were obliged to disclose it to the defense. Respondent argues, however, that the evidence was not material. This Court rejected the same *Brady* claim in the related case, *Ray Jr. v. Cate*, Case No. 10-1582 YGR (PR), Doc. no. 91 at 17-18. In that case, the Court found that evidence of the Ed-Green Market robbery was not material to Ray Jr.'s case in light of the overwhelming evidence of Ray Jr.'s guilt and the lack of evidence suggesting that the Ed-Green robbers were responsible for the robberies charged to Ray Jr. The Court stated, in relevant part:

> A review of the trial record indicates that the differences between the robberies defeated any inference that the Ed-Green robbers were the same robbers charged in the instant offense. Moreover, the vague similarities noted by Petitioner could match any number of robberies taking place in any location, and paled in comparison to the specific similarities between the charged counts themselves. Likewise, in denying Petitioner's post-trial motion to disclose exculpatory evidence of other robberies that took place in Oakland, the trial court noted that such evidence would have been "of limited value in establishing a defense, in view of the overwhelming evidence of the similarities of the figures stated on the surveillance tapes in this case." Resp. Exh. B9 at 1472-73.

> The court agrees with the trial court's assessment of Petitioner's claim. Petitioner was apprehended following a high speed chase after being observed by a police officer running from a 7-Eleven, and was linked to the instant robberies by the statements of two co-defendants. Resp. Exh. H at 19-22. There is absolutely no evidence to suggest that the Ed-Green robbers were responsible for the crimes with which Petitioner was charged. In view of the overwhelming evidence of Petitioner's guilt, the evidence that he claims was suppressed in violation of *Brady* (surveillance footage and photos from the Ed-Green robbery) is not material because its disclosure would not have presented a probability sufficient to undermine confidence in the outcome of the trial. *See Bagley*, 473 U.S. at 676; *Benn,* 283 F.3d at 1053.

*Id.*

United States District Court

For the Northern District of California

In Petitioner's case also, the jury was presented with overwhelming evidence of Petitioner's guilt. Petitioner confessed to all but three of the charged robberies and was linked to many of the robberies through the testimony of Larry Carrington, who admitted that he had committed several of the robberies with Petitioner. Carrington's descriptions of the robberies corroborated the descriptions Petitioner gave in his statement to Sgt. Phillips. Petitioner did not testify at trial and, in his closing argument, counsel's defense was not that Petitioner was wrongly accused, but that he acted under the influence of his father, Ray Jr. RT at 1420-21; 1425.

Furthermore, significant differences distinguished the charged robberies and the Ed-Green robbery. For instance, three men robbed the Ed-Green Market, whereas in this case eighteen of the twenty-three incidents were robberies committed by two men, and two of the remaining five robberies were committed by two men and one woman. Even the charged three-man robberies had distinguishing differences from the Ed-Green Market robbery. The lead robber in the Ed-Green Market robbery was African-American, in his twenties and armed with a semi-automatic handgun. He had a mustache and goatee. This description does not match any of the individuals involved in the robberies in this case. Moreover, the prosecution presented videotapes of many of the charged robberies so that the jurors were able to view the robberies as they were happening and to determine if any of the robbers in the videotapes fit Petitioner's description.

For all of these reasons, evidence of the Ed-Green Market robbery was not material because its disclosure would not have presented a probability sufficient to undermine confidence in the outcome of the trial. The state court's rejection of this claim was not objectively unreasonable.

**F. Claim Six – Confrontation Violation Based on Victims' Failure to Testify**

Petitioner argues that his right to confront and cross-examine witnesses against him was violated because the victims of Counts 1, 3, 6, 9 and 19 did not testify. In the related case, *Ray, Jr. v. Cate*, No. C 10-1582 YGR (PR), the Court denied the same claim, concluding, "There is no clearly established Supreme Court authority stating that a defendant's right of confrontation requires the victims of an offense to participate in a criminal prosecution by appearing in court or otherwise attending the trial." *Id.,* Doc. no 91 at 18-19. The Court denies Petitioner's claim for the same reason. Therefore, the state court's denial of this claim was not objectively unreasonable.

United States District Court
For the Northern District of California

**G. Claim Seven – Instructional Error**

Petitioner argues that the court's modification of CALCRIM No. 3515 into an "instruction on cross-admissibility" deprived him of a fair trial because "it effectively relieved the prosecution of its burden to prove each element of an offense beyond a reasonable doubt." Am. Pet'n at 18. By this, Petitioner apparently means that the prosecution did not have to prove every element of every count because the challenged instruction improperly allowed the jury to apply evidence pertaining to one count to all other counts. The Court of Appeal rejected Petitioner's claim without reaching the merits, on the erroneous finding that Petitioner failed to object below. However, Ray Jr. raised the same instructional error claim, which the Court of Appeal addressed on the merits.

**1. Court of Appeal Opinion**

In rejecting this claim, the California Court of Appeal stated as follows:

Both appellants contend that the court erred in instructing the jury using a modified form of CALCRIM 3515, which advised the jurors that "Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one. *In doing so, you must impartially compare and consider all the evidence that was received throughout the entire trial*." The court made clear it was giving this modification in lieu of a requested prosecution instruction on consideration of similar offenses to show identity under Evidence Code section 1101.

Both appellants insist that instructing the jury to consider "all the evidence" impermissibly allowed the jury to consider evidence on some counts that was not otherwise cross-admissible as evidence of guilt on other counts. Ray Jr. asserts that this permitted the jury to improperly convict him on at least some charges using inadmissible modus operandi evidence and Ray III argues that the instruction was prejudicial as to him in that it "effectively relieved the prosecution of its burden to prove each element of an offense beyond a reasonable doubt." Ray Jr. also complains that the court's instruction "left the jury with no guidance on proper consideration of evidence of similar acts to show pattern, intent, or identity (*People v. Ewoldt,* (1994) 7 Cal. 4th 380) and left the jury to speculate as to the sufficiency of additional counts to show identity."

. . .

Here there was no request by appellant to sever any of the multiple charged counts, and no evidence of any uncharged misconduct was presented to the jury. Rather, appellant was charged by a single information with a series of offenses, all of the "same class of crimes or offenses," which the prosecution argued were "connected together in their commission," and which appellant has never contended were inappropriately joined. Offenses may be connected together in their commission even though they "'do not relate to the same transaction and were committed at different times and places [and] against different victims.' [Citations.]" (*Alcala v. Superior Court* (2008) 43 Cal. 4th 1205, 1218.) Further, it is not required that evidence be cross-admissible before jointly charged offenses may be tried together before the same trier of fact. (§ 954.1; *People v. Zambrano* (2007) 41 Cal. 4th 1082, 1129, fn. 10, disapproved on another ground in *People v. Doolin* (2009) 45 Cal. 4th 390, 421, fn. 22.)

34

As discussed post, we do not agree with Ray Jr.'s contention that modus operandi was the only basis for cross-admissibility of evidence presented or the only manner in which other crimes was relevant.  Nevertheless, we will assume, without deciding, that not all of the robberies reflected common marks sufficient to establish identity circumstantially, and that if some of the offenses had been separately charged or uncharged, would not be sufficiently "similar" to meet the standards for admissibility.  Evidence of uncharged misconduct is admissible to prove identity when "the uncharged misconduct and the charged offense . . . share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts." *(People v. Ewoldt)*, supra, 7 Cal. 4th at p. 403; see also *People v. Thornton* (1974) 11 Cal. 3d 738, 756 [overruled on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12; inference depends upon the presence of distinctive "marks" that are "shared by the uncharged and charged crimes"].)

Ray Jr. was on notice, however, from the time of the prosecutor's opening statement that she intended to argue cross-admissibility but made no request for a limiting instruction on consideration of the evidence, either during the presentation of the prosecution case or after. "Under the doctrine of 'limited admissibility' [citation], certain evidence may be admissible for one purpose or against one party and inadmissible for another purpose or against another party.  Because it cannot be excluded, an objection to its admissibility will be futile.  Counsel is entitled only to an instruction to the jury, informing them of the limited purpose for which the evidence may be considered, and the fact that it went in without limitation is unappealable unless the instruction was requested. [Citations.]" (3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 382, p. 474.) . . .

Our Supreme Court has held that "[t]he trial court has no sua sponte duty to give a limiting instruction on cross-admissible evidence in a trial of multiple crimes." *(People v. Maury* (2003) 30 Cal. 4th 342, 394; see also *People v. Falsetta* (1999) 21 Cal. 4th 903, 924-925 [no sua sponte duty to instruct the jury as to the admissibility or use of other sex crimes evidence offered under Evidence Code section 1108 and no duty to edit defendant's partially incorrect instruction]; *People v. Collie* (1981) 30 Cal. 3d 43, 64 [no duty to give sua sponte limiting instruction on evidence of uncharged prior assaults on victim].)  A narrow exception to this rule has been recognized in the "'occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose.'" *(People v. Rogers* (2006) 39 Cal. 4th 826, 864 [quoting *People v. Collie, supra*, 30 Cal. 3d at p. 64].)  Since the evidence presented here was directly relevant to the legitimate purpose of proving elements of charged offenses, this is not such an "extraordinary case."

Resp. Exh. A at 24-29 (emphasis added).

## 2.  Federal Authority

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violated due process.  *Id.* at 72; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").  A determination

that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred. *Calderon v. Coleman*, 525 U.S. 141, 146 (1998). If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), before granting relief in habeas proceedings. *See Calderon*, 525 U.S. at 146-47.

### 3. Analysis

In the related case, *Ray, Jr. v. Cate*, No. C 10-1582 YGR (PR), the Court denied the same claim, as follows.

> Petitioner argues that the court's modification of CALCRIM 3515 deprived him of a fair trial because the instruction, as modified, failed to provide the jury with any guidance as to how to properly consider evidence of other crimes to show identity. Hab. Pet'n at 32-34, Resp. Exh. B at 59.
>
> Petitioner's argument lacks merit. The state court answered this precise question in the negative, concluding that, under California law, "the trial court has no sua sponte duty to give a limiting instruction on cross-admissible evidence in a trial of multiple crimes." Resp. Exh. H at 28. Moreover, there is no clearly established law providing that a state court violates due process by instructing a jury that they may consider evidence that is admissible on other counts to establish pattern, intent, identity, or modus operandi, as cross admissible to establish that person's guilt on other offenses that have been appropriately joined in the same charging document. Petitioner fails to identify, and the record does not reflect, any instance where the jury may have applied the modified version of CALCRIM 3515 in such a way as to convict Petitioner of offenses based on evidence that was otherwise inadmissible, or upon a lowered standard of proof. *See Gibson v. Ortiz*, 387 F.3d 812, 822 (9th Cir. 2004) (finding constitutional error where the jury is instructed that they can convict based on a preponderance of the evidence standard) *overruled on other grounds by Byrd v. Lewis*, 566 F.3d 855, 866 (9th Cir. 2009). Viewed in the context of the jury instructions and the record as a whole, the trial court's giving of CALCRIM 3515 did not violate due process. *See Estelle*, 502 U.S. at 72. Accordingly, the state court's decision was not contrary to or an unreasonable application of clearly established federal law, as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d).

*Ray, Jr. v. Cate*, No. C 10-1582 YGR (PR), Doc. no. 91 at 39.

This reasoning also applies to Petitioner's claim, which is identical to the claim made by Ray Jr. Petitioner has not shown the state court was objectively unreasonable in finding that there was no reasonable likelihood that the jury improperly considered evidence to be cross-admissible when it was not cross-admissible or, if the jury did so err, that the error amounted to a violation of federal law. *See Estelle*, 502 U.S. at 72, n.4 (on habeas review challenged instruction must be shown to have violated constitutional right). Furthermore, because evidence of Petitioner's guilt was overwhelming,

even if the jury considered some evidence cross-admissible when it was not, there was no reasonable likelihood that this error had a substantial or injurious effect on the jury's verdict. The state court's rejection of this claim was not objectively unreasonable.

### H. Claim Ten – Ineffective Assistance of Trial Counsel[3]

Petitioner argues trial counsel was ineffective because he failed to: (1) forward discovery to Petitioner; (2) consult adequately with Petitioner; (3) interview witnesses Petitioner stated would provide exculpatory testimony; (4) investigate or interview other witnesses; (5) object; (6) file motions; (7)  present mitigating evidence at sentencing; and (8) challenge restitution.

#### 1. Federal Authority

A claim of ineffective assistance of counsel is cognizable as a claim of the denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.*

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687–88. In other words, to demonstrate deficient performance, a petitioner is required to show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* at 687. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011). A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel

---

[3]The Court does not address claims 8 and 9 because they are procedurally defaulted.

United States District Court

For the Northern District of California

claims under § 2254. *Id.* at 1410–11. The general rule of *Strickland*, i.e., to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788.

A difference of opinion as to trial tactics does not constitute denial of effective assistance, *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir.), *cert. denied*, 469 U.S. 838 (1984). Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances. *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).

The investigation itself must be reasonable for an attorney's tactical decision based on that investigation to be reasonable. *Wiggins v. Smith*, 539 U.S. 510, 523-24 (2003). However, federal courts should not overlook the "wide latitude counsel must have in making tactical decisions;" therefore, there are no "strict rules" for counsel's conduct "[b]eyond the general requirement of reasonableness." *Pinholster*, 131 S. Ct. at 1406-07. A court must consider not only the quantum of evidence known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. *Wiggins*, 539 U.S. at 526-27.

### 2. Subclaim 1 – Failure to Forward Discovery

Petitioner faults counsel for not forwarding any discovery to him. Doc. no. 70 (Amended Petition) at 38-39. Petitioner fails to cite authority for the proposition that trial counsel is required to forward discovery to him and fails to indicate why not receiving discovery caused prejudice. This claim is denied.

### 3. Subclaim 2 – Failure to Consult with Petitioner

Petitioner faults counsel for failing to consult with him to obtain exculpatory information.

United States District Court

For the Northern District of California

However, in his next claim, Petitioner asserts he gave counsel the names of eighteen witnesses who would provide exculpatory testimony, showing that counsel did consult with Petitioner. Furthermore, except for the eighteen potential witnesses, discussed below, Petitioner does not specify what his advice would have been or why it would have proved exculpatory. Therefore, even if counsel did not consult with Petitioner, Petitioner fails to show a reasonable probability that, but for this failure, the result of the proceeding would have been different.

### 4. Subclaim 3 – Failure to Interview Petitioner's List of Witnesses

Petitioner claims counsel failed to interview eighteen individuals who would have provided exculpatory testimony.[4]

The duty to investigate and prepare a defense does not require that every conceivable witness be interviewed. *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995). To prevail on an ineffectiveness claim based on counsel's failure to call witnesses, a petitioner must present evidence that: (1) the witness actually existed and (2) the witness would have provided helpful evidence to the defense by submitting an affidavit from the witness. *Dows v. Woods*, 211 F.3d 480, 486 (9th Cir. 2000); *see also, Allen v. Woodford*, 395 F.3d 979, 1002 n.2 (9th Cir. 2005) (district court correctly disregarded counsel's failure to call witnesses petitioner mentioned to him because petitioner failed to make a showing they would have testified if counsel had pursued them as witnesses). A claim of failure to interview a witness cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel. *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986).

Petitioner fails to provide declarations from any of the eighteen individuals indicating they were willing to testify at his trial and what their testimony would be. On this basis alone, this claim must be denied. *See Dows*, 211 F.3d at 486. Nevertheless, the Court addressees Petitioner's specific arguments about each alleged witness.

---

[4]Petitioner lists the names of these eighteen potential witnesses in an appendix to his amended petition. Petitioner did not include the names of these eighteen people in his unnumbered petition to the California Supreme Court. For the reasons discussed above in regard to the procedural default of claims 8 and 9, this claim based on counsel's failure to interview the eighteen potential witnesses is also procedurally defaulted. However, in the interests of justice, the Court will address Petitioner's arguments pertaining to these individuals.

United States District Court

For the Northern District of California

### a. Sgt. Phillips

Petitioner argues that Sgt. Phillips would have testified that other robberies were open and unsolved, but were not charged to Petitioner, even though they had the same alleged modus operandi. Except for the Ed-Green Market robberies, Petitioner does not present evidence of other open robberies. Even if there were similar open robberies, counsel reasonably could have concluded evidence of similar robberies, if they occurred prior to Petitioner's arrest, would have been more prejudicial rather than helpful to Petitioner.

Petitioner also argues Sgt. Phillips would have testified that he lied to Petitioner when he interviewed him in order to obtain his confession. As explained above, that Sgt. Phillips lied to Petitioner about speaking to his father is not the sort of police tactic that would deprive Petitioner of his ability to give a statement voluntarily. Even if Sgt. Phillips had given such testimony, it would not have been exculpatory. Furthermore, because counsel knew what Sgt. Phillips would have said as a witness, there was no need for counsel to interview him. *See Eggleston*, 798 F.2d at 376. Petitioner does not show deficient performance or prejudice from counsel's failure to interview or to call Sgt. Phillips as a witness.

### b. Officer Passalacqua

Petitioner argues that Officer D. Passalacqua would have testified that the owner of the 7-Eleven in Count 1 was unwilling to provide police with the surveillance footage. Petitioner does not indicate how this testimony would have been helpful to him.

### c. Officer Kirkland

Petitioner argues Officer R. Kirkland would have testified that a "tracking device was taken" in regard to Counts 18 and 19. Petitioner does not offer an explanation about the "tracking device" or how testimony about it would be helpful to him.

Petitioner also contends that Officer Kirkland would have testified that the suspects' descriptions in Counts 8-9 were "fabricated" and this would have impeached the victim who testified that he was "unsure about the suspects." Am Pet'n at 70-1 at 11. Petitioner may not understand that a witness is impeached when evidence raises doubts about the truthfulness of the witness's previous statement because Officer Kirkland's alleged testimony would not have raised doubts about the

United States District Court

For the Northern District of California

victim's testimony that he was "unsure of the identify of the suspects." Furthermore, substantial evidence supported the jury's finding of guilt in regard to Counts 8-9; Petitioner admitted he was involved with the robberies, RT at 1220, 1222, and the jury was shown a videotape of the robbery, RT at 1023. Counsel was not deficient for failing to interview Officer Kirkland because he knew what he would say and because his testimony would not have aided in Petitioner's defense.

### d. Officer Guerro

Petitioner contends that Officer Guerro would have testified that he searched the R.V. where Petitioner was staying and found no evidence linking Petitioner to Counts 26-27. Petitioner contends this testimony would have created reasonable doubt.

This alleged testimony would not have created reasonable doubt. At most, it would have shown that Petitioner either did not live in the R.V. or he did not store incriminating evidence there. Petitioner fails to mention that he admitted committing the robberies charged in Counts 26-27, RT at 1203, 1230-31, and a videotape of the robbery was shown to the victims in court, RT at 669, 687. Counsel's failure to call Officer Guerro did not constitute deficient performance nor has Petitioner shown that it was prejudicial.

### e. Officer Neff

Petitioner argues that Officer Neff, who responded to the robbery charged in Count 1, would have testified that the victim told him the taller of the two robbers was African-American and the other robber wore a yellow shirt and had dark hair. Petitioner contends this was exculpatory because Petitioner and Ray Jr. are not African-American and were not wearing a yellow shirt when they were apprehended after the robbery.

Because the victim testified that he thought the taller robber was African-American, RT at 831-33, 844, Officer Neff's testimony on this point would not have impeached him. Although the victim's statement about the shorter robber wearing a yellow shirt and having dark hair may have conflicted with his testimony at trial and with Ray Jr.'s appearance at the time, the rest of his description of the robber--white, about five-eight, and skinny build--closely fit Ray Jr.

In any event, the evidence of Petitioner's guilt on Count 1 was overwhelming such that a reasonably competent counsel could have concluded there was no point in contesting it. After a high-

speed chase, the police apprehended Petitioner and Ray Jr. after they fled from the scene of the robbery in a stolen Honda.  The police found another stolen Honda near Petitioner's home.  The two stolen Hondas fit the modus operandi of other crimes for which Petitioner and Ray Jr. were charged.  A search of the getaway car revealed loot from the robbery.  Ray Jr. admitted to the police that he committed the robbery and was wearing a black shirt and red bandana when he did it.  This is the description that a police officer gave of one of the persons leaving the store after the robbery and was corroborated by the red bandana the police found between the driver's seat and the front door of the getaway car.  Therefore, even if the victim was wrong about the shorter robber wearing a yellow shirt and having black hair and the taller robber being African-American, overwhelming evidence showed that Ray Jr. was the shorter robber and Petitioner was the taller robber.  Any testimony from Officer Neff would not have impeached the victim nor would it have helped Petitioner's defense.

### f. Officer Martin

Petitioner asserts that Officer Martin, who was present when Petitioner was arrested, would have testified to events that happened during Petitioner's arrest and transport to Highland Hospital.  Petitioner asserts that Officer Martin would testify that Petitioner requested an attorney and said he wanted to remain silent.

Officer Martin's police report, Doc. 70-1 at 48, indicates that he observed other officers taking Petitioner out of his vehicle and then Officer Martin transported Petitioner to Highland Hospital.  The report does not indicate that Officer Martin interrogated Petitioner.  With no interrogation, Officer Martin was not required to advise Petitioner of his *Miranda* rights.  With no requirement to *Mirandize* Petitioner, it was unlikely that Officer Martin did so and unlikely that Petitioner would have invoked his rights without an advisement that he had them.  Because Petitioner does not submit a declaration from Officer Martin indicating what his testimony would be, Petitioner cannot show prejudice from defense counsel's failure to call him.

Petitioner also asserts that Officer Martin would testify that he told staff at Highland Hospital that Petitioner was involved in a car accident and received injuries as he fled from the vehicle and was wrestled down.  Apparently, Petitioner thinks this testimony would help his defense because the alleged testimony of other officers, discussed below, would impeach it.  However, even if Officer

Martin was impeached on this point, Petitioner's defense would not benefit because whether Petitioner fled from the vehicle was not relevant to whether he was guilty of committing the charged robberies.  Petitioner has not shown prejudice as a result of counsel's failure to call Officer Martin to testify.

### g. Sergeant Frugoli and Officer Leonis

Petitioner contends that Sgt. Frugoli and Officer Leonis would testify that Petitioner was not resisting when arrested and, thus, their testimony would impeach Officer Martin and Officer Saunders.  Officer Saunders testified that Petitioner resisted in that he did not open the passenger door and raise his hands when Officer Saunders ordered him to do so.  RT at 923-24; 947.  Sgt. Frugoli's report states, "I watched as the passenger was taken out of the car and handcuffed by Off. Saunders."  Doc. no. 70-1 at 49.  Therefore, Sgt. Frugoli's testimony would have confirmed rather than contradicted Officer Saunders' testimony.  Sgt. Frugoli's testimony also would have corroborated Officer Martin's report of his observations regarding petitioner's arrest.

Officer Leonis's report states, "As I ran towards the suspect vehicle, other Officers were already near the vehicle ordering both male white suspects out of the vehicle.  I could hear Officers requesting to see the suspects' hands.  As I approached the passenger side of the suspect vehicle, I provided cover for the Officers and pointed my firearm at the passenger until he was handcuffed by Officer Saunders."  Doc. no. 70-1 at 50.  Officer Leonis' report does not contradict Officer Saunders' testimony.  In any event, as stated above, whether Petitioner resisted arrest was not material to whether Petitioner was guilty of committing the charged robberies.

### h. Office D. Chimpky

Petitioner argues that Officer D. Chimpky, who was involved in the robbery charged in Count 12, would testify that the victim described suspect one, did not see suspect two and described suspect three as an African-American male, five-ten and weighing two hundred pounds.  Petitioner does not indicate how this testimony would have been favorable to him.  The victim's description of the two robbers at the trial was consistent with his statement to Officer Chimpky, the jury saw the videotape of the robbery and Carrington identified the two robbers as Petitioner and Ray Jr.  If a third person was assisting in the robbery, it would not have shown that Petitioner was not guilty of the crime.

United States District Court

For the Northern District of California

Petitioner has not shown ineffectiveness from counsel's failure to call Officer Chimpky.

### i. Sergeant Rodekohr

Petitioner states that Sgt. Rodekohr would have testified that the police detained two white male suspects in connection with the robbery charged in Count 23 and found "at least 15 pieces of evidence that could've linked these suspects to that robbery and others charged to Petitioner."  Doc. no. 70-1 at 13.  Petitioner offers no police report or other evidence substantiating these allegations. The detention of two suspects would not tend to exculpate Petitioner because the police often detain individuals and release them when a lack of evidence does not support charging them with a crime.

Further, the evidence of Petitioner's involvement in Count 23 was strong.  The jury saw a videotape and heard an audio tape of the robbery which captured Ray Jr.'s voice ordering the victim to open the register.  RT 242.  Carrington admitted to his participation and described the robbery in detail, aided by still photographs from the videotape.  RT 1003-10.  Therefore, counsel's decision not to call Sgt. Rodekohr was not deficient nor did it prejudice Petitioner.

### j. Detective Deutsche

Petitioner asserts that Detective Deutsche's testimony would have shown that the two suspects discussed previously were linked to one robbery, if not all of them.  Petitioner bases this conclusion on the fact that Detective Deutsche told the press that Petitioner was responsible for up to 100 vehicle thefts in the East Bay for use during the robberies which, according to Petitioner, would have "revealed that police were finding stolen vehicles they believed was [sic] used in robberies which would've established reasonable doubt and would've shown that a stolen vehicle used in a robbery was common."  Doc. 70-1 at 14.  Apparently, Petitioner is arguing that, if the jury heard that using a stolen car as a getaway vehicle was common, it would diminish the importance of the prosecution's modus operandi evidence that he used a stolen vehicle as a getaway car.  However, Petitioner's modus operandi was uncommon because he used two stolen vehicles--one for the robbery and one for the getaway and to throw pursuers off the track and Petitioner described his modus operandi to the police.  *See* RT at 1182-83, 1209.  Thus, the prosecution's modus operandi evidence would not have been discredited.  Moreover, evidence that Petitioner was responsible for up to 100 vehicle thefts was likely to be more prejudicial than helpful to his defense.  Counsel was not

United States District Court

For the Northern District of California

ineffective for failing to call Detective Deutsche as a witness.

### k. Ved Goyal

Petitioner argues that Ved Goyal, a victim in Count 1, would have testified that the robber was an African-American male wearing a black hooded jacket with the hood up, whereas Petitioner is white and was wearing a blue windbreaker when he was arrested after the robbery charged in Count 1.

Goyal's statement to Officer Passalacqua, doc. no. 70-1 at 23-24, was a description of the lead robber, whom the prosecution contended was Ray Jr., not Petitioner. In his statement, Goyal said that he only saw a little bit of the robber's face and his eyes for a few seconds. *Id.* A mistaken cross-racial identification of a masked robber, under the circumstances described by Goyal, would not be unusual. Even so, Goyal's description of Ray Jr.'s height as five-six and thin body build was accurate. Therefore, Goyal's testimony could have hurt Petitioner and Ray Jr. as much as it helped them. As discussed elsewhere, the evidence of Petitioner's guilt on Count 1 was overwhelming. Counsel's decision not to call Goyal as a witness was not deficient nor prejudicial.

### l. Akisha Barnes

Petitioner contends that Akisha Barnes, a witness to Counts 2-3, would have testified that all three robbers were African-American and that Melissa Ray, Petitioner's sister, had stopped working at the Long's Drugs in March 2005, contradicting the testimony of Allen Kung, Long's manager, that Melissa Ray worked at the store on July 12, 2005, the day of the robbery, but had been absent for a few days. Petitioner asserts that Barnes would also have testified that the store had been robbed in the past and the suspects did not request the victims to open the Reno Box.

Petitioner provides no supporting documentation that Barnes would have provided such testimony nor does he explain why testimony about his sister would have helped his defense. Petitioner admitted to the police that he twice robbed a Long's Drugs, and the dates of his admitted robberies correspond to the date of the robberies in Counts 2-3 and to the robbery in Count 4. The jury saw videotapes of both robberies and could compare the robberies to each other and could compare the robbers on the videotapes to the appearances and movements of Petitioner and his co-defendant in court. The evidence of Petitioner's involvement in Counts 2-3 and 4 was such that it

United States District Court

For the Northern District of California

was not reasonably probable that, but for counsel's failure to call Barnes, the result of the proceeding would have been different.

### m. Joanne Patton

Petitioner argues that Joanne Patton, a witness to the robbery in Count 12, would exonerate him by testifying that one of the robbers was a white male who was short and skinny, with yellowish orange hair, whereas Petitioner is six-two and Ray Jr. is five-ten.  Doc. no. 70-2 at 8.  However, Petitioner ignores that Patton described the robber as having a light complexion and wearing a black hooded sweater and green army pants and the police found such a pair of pants when they searched the Rays' R.V. on August 27, three months after the robbery in Count 12.  *See* RT at 1089; 1389-90 (prosecution's closing argument that videotapes of several robberies showed Ray Jr. wearing camouflage pants).  Furthermore, as mentioned above, the jury saw the videotape of the robbery, RT at 769, and Carrington identified the two robbers as Petitioner and Ray Jr.  RT at 1022-23.  Petitioner cannot show prejudice because it was not reasonably probable that, but for counsel's failure to call Patton, the result of the proceeding would have been different.

### n. Cleopatra Diggs

Petitioner argues that Cleopatra Diggs, also a witness to the robbery in Count 12, would testify that one of the robbers was a white male, real slender, about five-four, 130 pounds and without an accent.  Doc. no. 70-2 at 11.  Petitioner argues this would have exonerated him and his co-defendant because they are much taller than five-four and have distinct Pennsylvania accents.

Petitioner's comment about his and Ray Jr.'s Pennsylvania accents refers to the prosecutor's argument to the jury that it had heard Ray Jr.'s distinctive Pennsylvania accent when he testified.  *See* RT at 1392-93.  However, the fact that the prosecutor urged the jury to match Ray Jr.'s voice to the voice of the robber on one of the audiotapes does not suggest that an eyewitness to another robbery would have found Ray Jr.'s voice had an accent.  Diggs' statement showed nothing more than she may not have recognized an accent if one were present in the little speaking she reported the robber did.  Further, as stated above in relation to sub-claim m, the strong evidence supporting Petitioner's guilt on Count 12 was such that it was not reasonably probable that, but for counsel's failure to call Diggs, the result of the proceeding would have been different.

46

**United States District Court**

For the Northern District of California

### o. Terry King

Petitioner argues that Terry King would have testified that Petitioner "was at King's house barbecuing, playing with his kids, etc. provided [sic] the whereabouts on certain dates.  Thus exonerating petitioner for the crimes charged on certain dates.  His testimony would've revealed petitioner did not use drugs."  Doc. no. 70-1 at 15.

Petitioner provides no documentation substantiating that King would provide Petitioner with an alibi for "certain dates."  The lack of a declaration from King leads to the reasonable conclusion that he had no exonerating testimony to provide.  Petitioner does not explain why the fact that he did not use drugs was important because it was not an element of the crimes charged against him.[5] Accordingly, Petitioner fails to show counsel's decision not to call King was prejudicial.

### p. Crystal Roles

Petitioner argues that Crystal Roles would have testified that Petitioner was in Pennsylvania from April 5 through early August 2006 because she picked him up at the Greyhound Bus Station on April 5, 2006 and he sometimes stayed at her house between April and August 2006.   Petitioner also states that Roles would be a character witness for him because she would have testified that she knew Petitioner for many years and he did not use drugs.

Petitioner provides no documentation substantiating Roles' alleged testimony that Petitioner was in Pennsylvania from April 5 through early August 2006, when eighteen of the charged robberies took place.  If Roles knew Petitioner for many years, it seems likely that she would have provided such a declaration, if it were true.  Unfortunately for Petitioner, he described to the police with particularity the charged crimes he committed during this time period.  For example, he described the Round Table Pizza robbery which occurred on May 28, 2006 and the AM/PM robbery on July 18, 2006.  *See* RT at 12-13-14; 1217.  At his police interview, Petitioner denied involvement in several robberies about which Sgt. Phillips questioned him, *see* RT at 1199, establishing that Petitioner would have denied crimes which he did not commit and would not have described in detail crimes he could not have done if he were in Pennsylvania at the time.

---

[5]In a letter to the trial court at sentencing, Petitioner stated he was trying to get into a program for drug addicts and admitted he used cocaine.  CT at 1114.

United States District Court

For the Northern District of California

Further, as discussed above, whether Petitioner was involved with drugs was not an issue in his case and a character witness would not have overcome the overwhelming evidence that Petitioner was one of the robbers in all of the charged counts.  Therefore, the strong evidence supporting Petitioner's guilt was such that there was no reasonable probability that, but for counsel's failure to call Diggs, the result of the proceeding would have been different.

### q. Thomas Owen

Petitioner states that Thomas Owen, a detective in the Johnstown Police Department, would have been a character witness for Petitioner by testifying that he knew Petitioner since Petitioner was a baby, that Petitioner had no criminal record, did not use drugs and never engaged in violent acts or thefts.

Petitioner provides no evidence that Owen would provide such testimony.  In any event, the issue in this case was identity, not character.  Therefore, Owen's testimony would not have affected the jury's verdict.

### r. Nurses at Highland Hospital

Petitioner argues that two nurses at Highland Hospital would have testified that the police untruthfully stated that Petitioner fled on foot from the car and obtained his injuries "as a result of being wrestled down."  Petitioner seems to suggest that this testimony would put the credibility of all the officers at issue.  However, Petitioner provides no evidence that the nurses would so testify and, even if they did, whether Petitioner tried to escape and how he sustained the injuries to his face was not a trial issue.  Petitioner has not shown that counsel's performance was ineffective because he failed to call two Highland Hospital nurses.

In summary, Petitioner fails to show that counsel was ineffective on the ground that he did not investigate or to call the alleged witnesses because: (1) Petitioner provides no evidence that any of his potential witnesses would testify as he indicates; (2) in many of the cases, the alleged testimony would not be exculpatory or would not be relevant; and (3) the alleged testimony could not overcome the overwhelming evidence that Petitioner committed the charged robberies.  Therefore, the state court's denial of this claim was not objectively unreasonable.

### 5. Subclaim 4 -- Failure to Investigate or to Interview Witnesses

As discussed previously, a defense attorney has a general duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Strickland*, 466 U.S. at 691.  However, the Constitution requires only a general duty of reasonableness to investigate, there is no constitutional duty to investigate in a certain manner. *Pinholster*, 131 S. Ct. at 1406-07.  *Strickland* directs that "'a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 491).  Counsel need not pursue an investigation that would be fruitless or might be harmful to the defense. *Harrington*, 131 S. Ct. at 789-90.  A claim of failure to interview a witness cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel. *Eggleston*, 798 F.2d at 376.  A defendant's mere speculation that a witness might have given helpful information if interviewed is not enough to establish ineffective assistance. *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001).  Even assuming that counsel did not conduct pretrial investigation, an ineffective assistance claim could not succeed absent a showing that the state court was compelled to conclude that an investigation would have produced a more favorable result. *See Jackson v. Calderon*, 211 F.3d 1148, 1154-55 (9th Cir. 2000) (rejecting claim of ineffectiveness of counsel for failure to investigate where the petitioner failed to show that proper investigation would have produced useful information).

Petitioner does not specify what counsel should have investigated; presumably he means counsel should have investigated the eighteen potential witnesses he suggested.  As discussed above, the alleged testimony of these witnesses would not have aided in Petitioner's defense.  Therefore, the investigation Petitioner asserts trial counsel should have conducted would have produced only unhelpful witnesses.  Petitioner also has not shown prejudice because, even if counsel did not investigate witnesses, Petitioner has not shown a reasonable probability that, but for counsel's failure to investigate these witnesses, the result of the proceeding would have been different.

### 6. Subclaim 5 -- Failure to Object

Petitioner claims counsel was ineffective because he failed to object to the admission of any physical evidence, to the violation of his confrontation rights when several victims failed to testify, to

the line-up without counsel present and to his in-court identification by Stephen Macmanus and Nicole Johnson due to impermissibly suggestive procedures.

The claim based on failure to object to physical evidence fails because Petitioner does not explain why any physical evidence was objectionable and why any lack of objection caused him prejudice. *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (petitioner did not show that (1) had his counsel objected, it was reasonable that trial court would have sustained objection as meritorious; and (2) had objection been sustained, it is reasonable that there would have been an outcome more favorable to petitioner). As noted above, the failure of victims to testify is not a Confrontation Clause violation. Counsel cannot be faulted for failing to make a frivolous objection. *See Juan H.*, 408 F.3d at 1273) (trial counsel cannot have been ineffective for failing to raise a meritless motion). Also, as discussed above, although Petitioner's attorney may not have been present at his lineup, it did not prove prejudicial. Therefore, even if counsel's failure to object constituted deficient performance, habeas relief is not warranted because the failure to object was not prejudicial. *See Wilson*, 185 F.3d at 990.

In regard to the lineup, Petitioner asserts it was suggestive, but does not provide reasons for this assertion. Stephen Macmanus identified Petitioner and Ray Jr. in court as the robbers in Count 17. RT at 467. However, Macmanus identified other individuals as the suspects in the pretrial lineups; therefore, his testimony about the lineup identification, rather than prejudicing Petitioner, was to his advantage. Furthermore, defense counsel carefully cross-examined Macmanus about his failure to identify Petitioner at the lineup. RT at 479-81.

Nicole Johnson, the victim of the Safeway robbery in Count 29, made only a tentative identification of two individuals at the lineup. Defense counsel cross-examined Johnson about her failure to definitively identify the robbers at the lineup. RT at 723-29; 733. In light of the substantial evidence of Petitioner's involvement in the robbery in Count 29, discussed above, Petitioner has not shown that Johnson's tentative identification caused him prejudice. In particular, Carrington admitted to being one of the robbers in Counts 28 and 29; evidence established this robbery was similar to another robbery Petitioner and Carrington attempted two days later at the Village Market (Count 30), not far from the Safeway; the same day as the Village Market attempted robbery,

Petitioner and Carrington robbed the Viola Café (Counts 31-32) with a similar modus operandi to the robberies at Safeway and the Village Market; a few days later, Petitioner and Carrington returned to the Safeway with Melissa and attempted to rob it again (Count 33).  Petitioner never admitted involvement in the robberies in Counts 28 or 29, but he did not deny them and, in view of his admitted and otherwise established guilt in the other charged robberies, the jury had sufficient evidence to find Petitioner guilty of the two robberies in Counts 28 and 29.

Subclaim 5 fails because Petitioner has not established prejudice as a result of counsel's lack of objections.

### 7. Subclaim 6 – Failure to File Motions

Petitioner claims that counsel was ineffective because, except for the motion to exclude Petitioner's confession, counsel filed no motions.  Given the substantial evidence against Petitioner once his confession was deemed to be admissible, counsel could have concluded that there were no other meritorious motions to make.  *See Juan H.*, 408 F.3d at 1273 (counsel cannot be ineffective for failing to raise a meritless motion).

Further, in order to establish prejudice from counsel's failure to file a motion, a petitioner must show that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him.  *Wilson*, 185 F.3d at 990.  This claim fails because Petitioner does not specify what meritorious motions counsel should have filed and, if granted, how they would have affected the outcome of his case.

### 8. Subclaim 7 – Failure to Prepare for Sentencing

Petitioner argues that counsel failed to prepare for sentencing because he "overlooked the fact that there was not a record of testimony from the victim in Count 4, which is petitioner's principal count."

The Supreme Court has not decided what standard should apply to counsel's performance in non-capital sentencing proceedings.  *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1244 (9th Cir. 2005), *cert. denied*, 546 U.S. 944 (2005).  *Strickland* declined to "consider the role of counsel in an ordinary sentencing," and no later Supreme Court decision has done so, either.  *Id.*  Because no

United States District Court

For the Northern District of California

clearly established Supreme Court authority governs ineffective assistance of counsel claims in the noncapital sentencing context, the state court's denial of this claim could not have been contrary to or an unreasonable application of Supreme Court authority. *Davis v. Grigas*, 443 F.3d 1155, 1158-59 (9th Cir. 2006); *Cooper-Smith*, 397 F.3d at 1244-45.

Even on the merits, Petitioner's claim must be denied. Petitioner was sentenced to eight years for twenty-two occasions on which he committed crimes and victimized thirty-one people. *See* CT 1136. The lowest term for robbery is three years. *See* Cal. Penal Code § 213(1)(B). If Petitioner had received three years for each of the separate occasions on which he committed robbery, he would have been sentenced to over sixty years. Because Petitioner received such a lenient sentence, he cannot show prejudice from counsel's alleged deficient conduct.

### 9. Subclaim 8 – Failure to Object to Restitution Amounts

A federal habeas court is limited to review of challenges concerning the petitioner's being in custody in violation of the United States Constitution. See 28 U.S.C. § 2254. A federal court, then, lacks jurisdiction to hear claims that challenge the money portion of a state judgment, such as a restitution order, which does not affect the duration of custody. *Bailey v. Hill*, 599 F.3d 976, 981 (9th Cir. 2010) (affirming rejection of habeas ineffective assistance of counsel claim based on counsel's failure to challenge restitution order because restitution does not affect duration of custody). Because a claim challenging a restitution order is not cognizable on habeas review, so is a claim asserting that counsel was ineffective in connection to a restitution order. *Id.* (citing *Washington v. Smith*, 564 F.3d 1350, 1350 (7th Cir. 2009). Therefore, this claim is not cognizable on habeas review and is denied.

In summary, Petitioner has not established that counsel's performance was ineffective and, thus, the state court's denial of the ineffective assistance of counsel claim was not objectively unreasonable.

### I. Claim 11 – Insufficient Evidence

Petitioner claims his convictions were supported by insufficient identification evidence.

#### 1. Federal Authority

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re*

**United States District Court**
For the Northern District of California

*Winship*, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt states a constitutional claim, which, if proven, entitles him to federal habeas relief.  *Jackson v. Virginia*, 443 U.S. 307, 321, 324 (1979).

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992).  Nor does a federal habeas court in general question a jury's credibility determinations, which are entitled to near-total deference.  *Jackson*, 443 U.S. at 326.  If confronted by a record that supports conflicting inferences, a federal habeas court "must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Id.*  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted.  *Jackson*, 443 U.S. at 324.

After AEDPA, a federal habeas court applies the standards of Jackson with an additional layer of deference.  *Juan H.*, 408 F.3d at 1274.  To grant relief, a federal habeas court must conclude that "the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable."  *Boyer v. Belleque*, 659 F.3d 957, 965 (9th Cir. 2011); *see also Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam) ("*Jackson* claims face a high bar in federal habeas proceedings . . .").

### 2. Analysis

As mentioned above, the evidence against Petitioner was strong.  The strongest evidence was the fact that Petitioner admitting to committing almost all of the charged offenses.  His admissions were corroborated by Larry Carrington who testified that he acted with Petitioner in committing the crimes charged in Counts 4 (RT at 994-95; 1021), 7 (RT at 1021), 13 (RT at 1029); 23 (RT at 1003); 24 (RT 1029-30); 26-27 (RT at 1011); 28-29 (RT at 1028-29); 30 (1026-27); 31-32 (RT at 1026-28);

and 33 (RT at 999, 1028). Carrington also identified in court Petitioner, Ray Jr., and himself from photographs and videotapes taken from surveillance cameras at the stores that were robbed in Counts 5-6 (RT at 1013-14); 11 (RT at 1015); 12 (RT at 1022); 14 (RT at 1023); 20 (RT at 1023-24); 23 (RT at 1005); 24 (RT at 1029-30); 26-27 (RT at 1012); and 31-32 (RT at 1025-26). This evidence alone, viewed in the light most favorable to the prosecution, is sufficient to establish that any rational trier of fact would have found guilt beyond a reasonable doubt, not only to the counts to which Petitioner admitted and Carrington confirmed, but the few remaining counts that were sufficiently similar to them.

Petitioner argues that the quality of the video tapes "were not so high that Petitioner could be identified as one of the masked and hooded robbers." However, when Carrington was asked to identify Petitioner from several tapes, he distinguished the tapes where he was not able to identify Petitioner. *See* RT at 1022, 1023, 1024. Carrington also said that he identified Petitioner from his movements and the way he acted during the robberies. *See* RT at 1014. Thus, even though the quality of some of the videotapes may have been poor, the quality of many of them were adequate for Carrington, who committed at least ten robberies with Petitioner, to identify Petitioner. Furthermore, in considering the videotapes together with the other evidence, the jury would have had no doubt that Petitioner was one of the robbers.

Petitioner argues that the evidence of "modus operandi" was not sufficiently distinctive to establish "a signature," or that the same perpetrators committed all the robberies. Am. Pet'n at 46-47. For instance, Petitioner states, "There is nothing distinctive about wearing bandanas and hooded sweatshirts in the commission of a robbery," and, the modus operandi was common in that "Robbers in a stolen car drove up[,] entered the store with guns[,] grabbed money and goods, and left." *Id.* at 50-51.

As discussed above, although individual aspects of the robberies were common, there were many uncommon characteristics. For instance, all but two of the crimes occurred in two geographical areas: the northern part of Oakland and the border area between Oakland and Alameda, both areas where the R.V. belonging to Ray Jr. was parked. Another distinctive characteristic of the charged crimes was the use of two stolen vehicles, which were mainly Hondas. The accumulated

United States District Court

For the Northern District of California

characteristics of the crimes--the robbers targeted the same type of stores, took the same type of loot, dressed similarly, used the same weapons and used similar methods--made them uncommon enough that the direct evidence of Petitioner's involvement in some of them, such as Count 1, supported a strong inference that Petitioner was involved in all of them.

For all of these reasons, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes, including the identification of Petitioner as the robber, beyond a reasonable doubt. *See Payne*, 982 F.2d at 338. The state court's denial of this claim was not objectively unreasonable.

### J. Summary of Rulings on Claims

In summary, Petitioner's claims are denied as follows.  The Court independently reviewed the record on the following claims and found that their denials by the state court were not objectively unreasonable: Claim 1 (Sixth Amendment violation based on lineup without attorney present); Claim 2 (Sixth Amendment speedy trial violation); Claim 3 (ineffective assistance of appellate counsel); Claim 6 (Confrontation Clause violation); Claim 7 (jury instruction error); Claim 10 (ineffective assistance of trial counsel); and Claim 11 (insufficient evidence).   On Claim 4, the *Miranda* claim, the Court did not disturb the presumption of correctness accorded to the state court's determination of credibility and, in its independent review of the record, the Court concluded that Petitioner's statements were voluntary.  On Claim 5, the *Brady* claim, the Court found that evidence of the Ed-Green Market robbery was not material and that the state court's rejection of the claim was not objectively unreasonable.  Claims 8 (Due Process violation by appellate court) and 9 (prosecutorial misconduct) were procedurally defaulted.

### III. Petitioner's Motion for Reconsideration

Petitioner moves for reconsideration of the Court's denial of his motion for Respondent to produce a copy of the transcript of Petitioner's *Marsden* hearing which, he argues, is relevant to his claims of ineffective assistance of counsel.  Doc. no. 111 (Reconsideration); Doc. no 22 (Motion). The Court denied the motion as premature because, at that time, Respondent had filed a dispositive motion and the petition had not yet been submitted for review on the merits.  Doc. no. 68.

Petitioner does not indicate how the *Marsden* transcript would aid his ineffective assistance of

counsel claims.  The hearing on the *Marsden* motion took place during a recess at Petitioner's preliminary examination, before his trial began.  *See* Doc. no. 22.  Because counsel's representation of Petitioner had barely begun at the time of the *Marsden* hearing, it is unlikely anything at that hearing could add to the many grounds of ineffectiveness that Petitioner has raised in this petition and that this Court has denied.  The motion for reconsideration of the ruling on the *Marsden* hearing transcript is DENIED.

**CONCLUSION**

For the foregoing reasons, the Court DENIES the Petition for Writ of Habeas Corpus as to all claims and DENIES Petitioner's motion for reconsideration.  A certificate of appealability will not issue.  Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong."  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may seek a certificate of appealability from the Court of Appeals.

This Order terminates docket number 111.  The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED:   August 4, 2014

Y**VONNE** G**ONZALEZ** R**OGERS**
U**NITED** S**TATES** D**ISTRICT** C**OURT** J**UDGE**

G:\YGRALL\Prisoner Pro Se Cases\2011\Ray III 11-1604 hc.rmhREV.wpd